# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself and its members; **CATHOLIC MEDICAL ASSOCIATION**, on behalf of itself and its members; and **JEANIE DASSOW, M.D.**,<br><br>*Plaintiffs,*<br><br>v.<br><br>**XAVIER BECERRA**, in his official capacity as Secretary of the United States Department of Health and Human Services; **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**; **LISA J. PINO**, in her official capacity as Director of the Office for Civil Rights of the U.S. Department of Health and Human Services; and **OFFICE FOR CIVIL RIGHTS OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**,<br><br>*Defendants.* | No. 1:21-cv-00195-TAV-SKL |

**Declaration of Jeanie Dassow, M.D.**

1. I, Jeanie Dassow M.D., under 28 U.S.C. § 1746, declare as follows:

2. I am over eighteen years old and make this declaration on personal knowledge. If called as a witness, I could and would testify competently to the matters set forth here.

**A. My Medical Practice**

3. I am a board-certified obstetrician and gynecologist in Chattanooga, Tennessee.

4. I serve as the Clerkship Director and Assistant Professor of Obstetrics and Gynecology at the University of Tennessee Chattanooga – College of Medicine.

1

5. I practice medicine in Chattanooga at UT Erlanger Women's Health, a medical clinic.

6. I also travel to one of Erlanger's rural clinics to treat patients.

7. I am the medical director of a local rural pregnancy help center.

8. I earned an M.D. with highest distinction from the University of Kentucky College of Medicine in 1987. I completed an obstetrics and gynecology internship and an obstetrics and gynecology residency at the Washington University School of Medicine in 1991.

9. Along with general ambulatory OBGYN care, I have a special interest in pediatric and adolescent gynecology, including complex medical problems, along with premenstrual syndrome and menopause.

10. As a result, I receive referral patients with puberty issues. I also care for the gynecology needs of pediatric patients with complex medical disorders.

11. Another practice interest is the care of perimenopausal and post-menopausal women. In this capacity, I often prescribe hormone therapy.

12. I provide medical care in health programs and activities receiving federal financial assistance under 42 U.S.C. § 18116, including Medicaid, Medicare, or Tennessee CoverKids (CHIP), and in programs and activities receiving grants from Defendant U.S. Department of Health and Human Services (HHS).

13. My employer Erlanger Health System receives millions annually in HHS grants.

14. Erlanger Health System is incorporated as the Chattanooga-Hamilton County Hospital Authority.

15. In FY2021, HHS granted Erlanger $7.41 million, including $3.4 million in grants under the American Rescue Plan Act funding for health centers.[1]

16. Erlanger/Chattanooga-Hamilton receives grants from HHS/HRSA for its community health centers.[2]

17. Erlanger/Chattanooga-Hamilton has also recently received grants from HHS for health center infrastructure support, HHS administered CARES Act funding, Coronavirus Supplemental Funding for Health Centers, and funding to expand capacity for coronavirus testing. *Id.*

18. I am a member of the Christian Medical and Dental Associations.

**B. My Commitment to Providing High-Quality Healthcare to All**

19. I provide high-quality medical services to all people, regardless of their "internal sense of gender."

20. For me, the Hippocratic Oath, my faith, and my commitment to the medical professional demand nothing less.

21. I believe that a patient with medical needs, such as a broken bone, an infection, or cancer, should be given the best medical care possible, regardless of identity.

22. I am compelled by my religious faith to provide healthcare to all patients I encounter, including patients who have undergone what have been called gender transitions or interventions.

23. My more than 30 years of experience reflects a compassionate and inclusive practice of healthcare. I treat each patient as an individual, seeking to

---

[1] Recipient Profile, Chattanooga Hamilton County Hospital Authority, USASpending.Gov (accessed Oct. 28, 2021), https://www.usaspending.gov/recipient/71acf772-17cf-2ee8-2e03-89b2ec336d80-P/latest ; Award Profile, Grant Summary FAIN H8F41319 USASpending.gov, (accessed Oct. 28, 2021), https://www.usaspending.gov/award/ASST_NON_H8F41319_7526 .
[2] See https://taggs.hhs.gov/Detail/RecipDetail?arg_EntityId=xJOO%2FRHJ%2B9St074Vxq3dbQ%3D%3D ;
.

3

understand the person's holistic needs and personal medical and psychological history. I understand that people have many different views and experiences in life, and so I seek to help them in a non-judgmental way explore what medical care may be best for them. I strive to have a patient-centric practice under which patients can obtain the care and treatment that they seek and prefer.

24. I provide respect and care for all female patients, irrespective of gender identity, sexual orientation, religious belief, political position affiliations, and reproductive health history. For instance, in my non-directive counseling attendant on my medical examinations, I respect my patients who have had elective abortions without regrets, and I also respect my patients who have had abortions but who do experience regret, referring these patients to a compassionate therapist if counseling is indicated and desired.

25. My individual-centric and compassionate view of healthcare extends to my significant practice in the prescription of hormones and puberty blockers. For many women, hormone therapy is medically indicated when, at a patient's wish, it helps manage menopause. For precocious puberty, such as menstruation beginning in five- year-old girls, puberty blockers are a proven and safe treatment and can be medically indicated, provided patients' parents provide the appropriate consent.

26. I provide medical services for reasons other than gender interventions, but those same services are ones that other doctors provide for gender interventions affirming gender identity.

27. Differences exist between adults who underwent a gender-intervention process decades ago and patients who have not done so, or who are in the middle of this process, a difference heightened between older adults and minors. One key difference is that, for an adult whose interventions occurred decades ago and who has been on hormones for a long time, the hormones' effects have long since nearly entirely occurred, including many permanent changes.

4

28. For me, prescribing hormones to this category of older adult patients involves causing relatively little effect compared to prescribing the same hormones for non-transitioned or mid-transition patients, especially non- transitioned or mid-transition minors, who lack adult maturity and autonomy and who should have parental involvement for major medical decisions. I have thus, on a case-by-case basis, and when my clinical judgment favors it, prescribed hormones to long-transitioned adult patients when the continued use of hormones would not have a significant effect or change on the status quo of their health.

29. But, based on my medical judgment, I do not believe that gender-transition procedures or interventions for pre-transition or mid-transition patients, especially minors, serve their best interests. I thus have not provided hormones to pre-transition or mid-transition patients, given these therapies' significant and permanent damaging effects, which are especially significant for minor patients.

30. Times occur when puberty blockers are appropriate for minors with parental consent. I treat patients using puberty blockers for precocious puberty. An example would be a five-year-old who begins menstruation prematurely. There is proven safety of these interventions at younger ages to delay puberty until the time of its natural onset. But I do not offer or prescribe puberty blockers to older minors in adolescence to delay the natural onset of puberty, given the unproven safety of this course of puberty blockers. Many studies suggest that prescribing puberty blockers for gender dysphoria almost invariably leads minors to proceed with dangerous cross-sex hormones and surgery.

31. I treat patients accurately by sex and refer to clients with biologically correct pronouns. If others create charts that are worded based on gender identity I will work in those charts, but if I create charts and medical records I do so using accurate biological sex.

### C. Medical, Ethical, and Religious Positions

32. I have medical, ethical, and religious objections to these activities and speech:

   a. Prescribing puberty blockers off-label from the FDA-approved indication to treat gender dysphoria and initiate or further transition in adults and children;

   b. Prescribing hormone therapies off-label from the FDA-approved indication to treat gender dysphoria in all adults and children;

   c. Providing other continuing interventions to further gender transitions ongoing in both adults and minors;

   d. Performing hysterectomies or mastectomies on healthy women who believe themselves to be men;

   e. Removing the non-diseased ovaries of healthy women who believe themselves to be men;

   f. Removing the testicles of healthy men who believe themselves to be women;

   g. Performing a process called "de-gloving" to remove the skin of a man's penis and use it to create a faux vaginal opening;

   h. Remove vaginal tissue from women to facilitate the creation of a faux or cosmetic penis;

   i. Performing or participating in any combination of the above mutilating cosmetic procedures to place a patient somewhere along the socially constructed gender identity spectrum;

   j. Offering to perform, provide, or prescribe any and all such interventions, procedures, services, or drugs;

   k. Referring patients for any and all such interventions, procedures, services, or drugs;

l. Ending or modifying their policies, procedures, and practices of not offering to perform or prescribe these procedures, drugs, and interventions;

m. Saying in my professional opinion that these gender intervention procedures are the standard of care, are safe, are beneficial, are not experimental, or should otherwise be recommended;

n. Treating patients according to gender identity and not sex;

o. Expressing views on gender interventions that I do not share;

p. Saying that sex or gender is nonbinary or on a spectrum;

q. Using language affirming any self-professed gender identity;

r. Using patients' preferred pronouns according to gender identity, rather than using no pronouns or using pronouns based on biological sex;

s. Creating medical records and coding patients and services according to gender identity not biological sex, except that I will code a patient "transgender male to female" if that is their medical situation and they are on opposite sex hormomes;

t. Providing the government assurances of compliance, providing compliance reports, and posting notices of compliance in prominent physical locations;

u. Refraining from expressing my medical, ethical, or religious views, options, and opinions to patients or others when those views disagree with gender identity theory or transitions;

v. Allowing patients to access single-sex programs and facilities, such as mental health therapy groups, breastfeeding support groups, post-partum support groups, educational sessions, changing areas, restrooms, communal showers, and other single-sex programs and spaces, by gender identity and not by biological sex.

7

33. I do not have policies or practices for engaging in these objectionable practices, and I object to changing my policies or to implementing different policies.

34. First, I object in my medical judgment and professional ethics to offering, performing, or endorsing the objectionable procedures described above, especially on patients who are minors or who are considering whether to embark on gender interventions.

35. Second, I have conscientious and religious objections as a Christian to these objectionable practices. Compelling me to perform, offer, facilitate, affirm, or refer for the performance of gender-transition procedures, drugs, or interventions for pre-transition or mid- transition patients, especially minors, would thus violate my medical judgment and my religious beliefs.

36. My compliance with these beliefs and my speech about these beliefs is a religious exercise. I exercise my religious beliefs by providing healthcare and through expressing messages in my healthcare practices, especially by providing healthcare to low-income and underserved populations in health programs and activities funded by the government.

37. I intend to retain and not modify my current policies and practices of not offering, affirming, prescribing, performing, participating in, or referring for these interventions. I intend to reserve my medical judgment for individual cases, as well as abide by my religious, conscientious, and ethical judgments about prescribing hormones or puberty blockers for new or ongoing gender interventions or other patients experiencing gender dysphoria. I also intend to continue speaking about these subjects in the same way that I have in the past.

**D. Effect of HHS's Grants Rule Gender Identity Mandate**

38. If the gender identity mandate of the 2016 Grants Rule is enforced against me, it would pressure me as a doctor, as a condition of participating in a program receiving HHS grants, to offer, provide, or refer for gender-transition interventions,

8

treat patients as if their sex is their gender identity and not their actual biological sex, and engage in speech affirming gender identity—regardless of my medical judgment and religious or ethical objections.

39. I have treated or currently treat transgender-identifying individuals, and if a gender identity mandate were enforced against me, and I did not comply, I would be liable for failure to provide, participate in, offer, affirm, or refer for medical transition procedures.

40. I thus would be unlikely to remain in medical practice if the gender identity mandate is enforced against me in my workplaces.

41. If the gender identity mandate were enforced against me, it would limit or prohibit my ability to engage in speech advising patients of my medical judgment about gender-transition procedures.

42. In particular, if a gender identity mandate were enforced against me, it would chill, limit, or prohibit my speech, including my ability to (1) discuss my medical opinions with my patients and offer medical advice freely; (2) have full and frank conversations on alternatives to gender procedures and interventions; (3) warn patients about the risks and harms of gender interventions; (4) advise patients that they should have healthcare treatments based on biological sex, not gender identity; (5) use accurate descriptions of sex in coding and medical records and charts according to biological sex; and (5) implement the accurate spoken and written use of biologically correct pronouns. I would be unlikely to express my full and frank views to patients for fear of liability.

43. If I were to accede to the gender identity mandate, it would cause me to take on increased risk of malpractice liability because of the risks and harms of those interventions, and of patients later regretting the decision to undergo those interventions, if I performed them or did not warn against them.

9

### E. Injury from the Gender Identity Mandate

44. If the gender identity mandate were enforced against me, my choices would be (1) not comply with the government's mandates, and risk being driven out of my workplaces and much of the healthcare field and market; or (2) comply with the government's mandate, abandoning my medical, conscientious, and religious beliefs, and accept the dangers and burdens of compliance.

45. If the gender identity mandate were enforced against me, and I do not comply, my practice would risk not being able to participate in programs receiving HHS grants, and I could face loss of income and employment.

46. If a gender identity mandate were enforced against me, and I were to comply, I would also incur financial costs of compliance, such as burdens of time and resources to plan compliance, and malpractice liability due to the harms associated with objectionable practices I would be forced to provide.

47. More importantly, if I were to comply with the gender identity mandate, I would suffer the loss of their integrity and reputation because it will be perceived that I profess one thing but do another. That loss of integrity and reputation would devastate my conscientious medical practice and it would make patients less likely to trust me.

48. I seek to continue to speak freely on these matters in healthcare each day in each clinical situation as I deem appropriate, as I have done.

49. My provision of healthcare in accord with my medical judgment and religious beliefs.

50. My actions have prevented no one from obtaining gender interventions from many other providers.

## VERIFICATION

I, Jeanie Dassow, M.D., a citizen of the United States, declare under penalty of perjury under 28 U.S.C. § 1746 that this Declaration is true and correct based on my personal knowledge.

Executed this 5 day of November, 2021.

*Jeanie Dassow*
Jeanie Dassow, M.D.