# Exhibit 2

Opposition to Preliminary Injunction, *Christian Employers Alliance v. EEOC et al.*, 1:21-cv-195 ECF No. 18 (D. N.D. Nov. 22, 2021)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| Christian Employers Alliance,  )  *Plaintiff*,  )  v.  )  United States Equal Employment  )  Opportunity Commission, *et al.*.  )  *Defendants*.  ) | Case No. 1:21-cv-195-MDT-CRH |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Acting Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

*/s/ Christopher D. Dodge*
Christopher D. Dodge
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................3

I.     Statutory and Regulatory Background...............................................................................3

      A.     Title VII's Prohibition On Sex Discrimination And EEOC ...........................3

      B.     Section 1557, Title IX, and HHS ...................................................................5

      C.     HHS's prior rulemaking under § 1557............................................................6

           1.     *The 2016 Rule and related litigation.* ................................................6

           2.     *The 2020 Rule and related litigation.* ................................................7

           3.     *The 2021 Notification.* ......................................................................9

II.    Plaintiff And This Litigation.............................................................................................10

LEGAL STANDARD ...............................................................................................................11

ARGUMENT ...........................................................................................................................11

I.     The Court Lacks Subject-Matter Jurisdiction Over CEA's Challenge To Hypothetical Future Enforcement Actions And CEA Therefore Cannot Prevail On The Merits ..............11

      A.     CEA has failed to demonstrate standing and ripeness for its challenge to EEOC's future enforcement of Title VII. ........................................................15

           1.     *Plaintiff has not pled an injury traceable to EEOC.* .......................15

           2.     *Plaintiff's claims against EEOC are not ripe.* .................................20

      B.     CEA has failed to demonstrate standing and ripeness for its challenge to HHS's future enforcement of § 1557. ...........................................................24

           1.     *Plaintiff lacks standing to challenge HHS's interpretation of § 1557* ...........................24

           2.     *Plaintiff's claims against HHS are not ripe.* ...................................28

      C.     CEA has failed to establish associational standing on behalf of its unidentified members. ...................................................................................29

II.    CEA's Claims Are Unlikely To Succeed On Their Own Merits.........................................33

      A.     EEOC and HHS do not substantially burden any person's religious practice...........33

B.      Plaintiff cannot prevail on its First Amendment claims. .................................34

C.      EEOC and HHS have not violated the Administrative Procedure Act. .....................38

    1.      There is no final agency action in this case. ...................................................38

    2.      Both § 1557 and Title VII provide alternate remedies that preclude review under
            the APA. ................................................................................................................43

    3.      EEOC and HHS have not acted contrary to law or arbitrarily and capriciously. ..........47

    4.      Judicial comity weighs against entering any relief under the APA in this case. ...............50

III.    CEA Has Failed To Show Irreparable Harm ..............................................................51

IV.     The Balance Of Equities And Public Interest Favor Denying Plaintiff's
        Motion .............................................................................................................................53

CONCLUSION ..........................................................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner,*
   387 U.S. 136 (1967) .................................................................................................................50

*Adventist Health Sys./SunBelt, Inc. v. Dep't of Health & Hum. Servs.,*
   Case No. 21-1589, 2021 WL 5170810 (8th Cir. Nov. 8, 2021).............................................53

*Agred Found. v. United States Army Corps of Engineers,*
   3 F.4th 1069 (8th Cir. 2021)...................................................................................................13

*Am. Hosp. Ass'n v. Bowen,*
   834 F.2d 1037 (D.C. Cir. 1987) .............................................................................................50

*Am. Tort Reform Ass'n v. OSHA,*
   738 F.3d 387 (D.C. Cir. 2013) ...............................................................................................39

*ARC of Iowa v. Reynolds,*
   Case No. 4:21-CV-00264, 2021 WL 4166728 (S.D. Iowa Sept. 13, 2021)........................53

*Ass'n of Am. Med. Colleges v. United States,*
   34 F. Supp. 2d 1187 (C.D. Cal. 1998)...................................................................................44

*AT&T Co. v. EEOC,*
   270 F.3d 973 (D.C. Cir. 2001) ...............................................................................20, 40, 41

*Balogh v. Lombardi,*
   816 F.3d 536 (8th Cir. 2016)..................................................................................................18

*Bandag, Inc. v. Jack's Tire & Oil, Inc.,*
   190 F.3d 924 (8th Cir. 1999)..................................................................................................51

*Bd. of Educ. of the Highland Local Sch. Dist. v. Dep't of Educ.,*
   208 F. Supp. 3d 850 (S.D. Ohio 2016)..............................................................................45, 46

*Beame v. Friends of the Earth,*
   434 U.S. 1310 (1977)..............................................................................................................52

*Blackhawk v. Pennsylvania,*
   381 F.3d 202 (3d Cir. 2004) ..................................................................................................35

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020).....................................................................................................*passim*

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) .................................................................................................43

*Brady v. Nat'l Football League,*
    640 F.3d 785 (8th Cir. 2011) ..................................................................................11

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014) ...........................................................................................30

*California Bankers Ass'n v. Shultz,*
    416 U.S. 21 (1974) .................................................................................................22

*California v. Texas,*
    141 S. Ct. 2104 (2021) ...........................................................................................14

*Care Comm. v. Arneson,*
    638 F.3d 621 (8th Cir. 2011) ..................................................................................29

*Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.,*
    643 F.3d 1142 (8th Cir. 2011) ................................................................................43

*CHS, Inc. v. PetroNet, L.L.C.,*
    Civ. No. 10–94 RHK/FLN, 2010 WL 4721073 (D. Minn. Nov. 15, 2010) ...............52

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) .......................................................................................... 34, 35

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .....................................................................................11, 12, 14

*Colwell v. HHS,*
    558 F.3d 1112 (9th Cir. 2009) ................................................................................29

*Communist Party of the U.S. v. Subversive Activities Control Bd.,*
    367 U.S. 1 (1961) ...................................................................................................22

*Communities for a Great Nw., Ltd. v. Clinton,*
    112 F. Supp. 2d 29 (D.D.C. 2000) .........................................................................42

*Cornish v. Dudas,*
    540 F. Supp. 2d 61 (D.D.C. 2008) .........................................................................54

*CSX Transp., Inc. v. Surface Transp. Bd.,*
    774 F.3d 25 (D.C. Cir. 2014) .................................................................................40

*Ctr. for Auto Safety v. NHTSA,*
    452 F.3d 798 (D.C. Cir. 2006) ...............................................................................41

iv

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ................................................................................................12

*Dakota Res. Council v. N. Dakota Pub. Serv. Comm'n,*
   Case No. 1:12-CV-064, 2013 WL 12085480 (D.N.D. Sept. 3, 2013) ......................42

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
   640 F.2d 109 (8th Cir. 1981) ..................................................................................11

*Defs. of Wildlife v. EPA,*
   882 F.2d 1294 (8th Cir. 1989) ........................................................................... 43, 45

*Digital Recognition Network, Inc. v. Hutchinson,*
   803 F.3d 952 (8th Cir. 2015) ..................................................................................18

*DRG Funding Corp. v. Secretary of Housing and Urban Development,*
   76 F.3d 1212 (D.C. Cir. 1996) ...............................................................................41

*EEOC v. Roman Cath. Diocese of Raleigh,*
   48 F. Supp. 2d 505 (E.D.N.C. 1999); *aff'd,* 213 F.3d 795 (4th Cir. 2000) ................. 34, 35

*Elgin v. Dep't of Treasury,*
   567 U.S. 1 (2012) ...................................................................................................47

*Flast v. Cohen,*
   392 U.S. 83 (1968) .................................................................................................12

*Food & Commercial Workers International Union v. IBP, Inc.,*
   857 F.2d 422 (8th Cir. 1988) ..................................................................................20

*Franciscan All., Inc. v. Becerra,*
   Case No. 7:16-CV-00108-O, 2021 WL 3492338 (N.D. Tex. Aug. 9, 2021) .................7

*Franciscan Alliance v. Azar,*
   414 F. Supp. 3d 928 (N.D. Tex. 2019) ............................................................... 7, 26

*Franciscan Alliance v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016) .....................................................................6

*Fulton v. City of Philadelphia,*
   141 S. Ct. 1868 (2021) ...........................................................................................35

*Garcia v. Vilsack,*
   563 F.3d 519 (D.C. Cir. 2009) ...............................................................................43

*Gen. Electric Co. v. Gilbert,*
   429 U.S. 125 (1976) ...............................................................................................20

v

*Gen. Finance Corp. v. FTC,*
  700 F.2d 366 (7th Cir. 1983) ...................................................................................46

*Gen. Tel. Co. of the Nw. v. EEOC,*
  446 U.S. 318 (1980) ...................................................................................................4

*General Motors Corp. v. Harry Brown's, LLC,*
  563 F.3d 312 (8th Cir. 2009) ...................................................................................11

*Georator Corp. v. EEOC,*
  592 F.2d 765 (4th Cir. 1979) ...........................................................................23, 42

*Giboney v. Empire Storage & Ice Co.,*
  336 U.S. 490 (1949) ..................................................................................................37

*Golden & Zimmerman, LLC v. Domenech,*
  599 F.3d 426 (4th Cir. 2010) ...................................................................................40

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418, (2006) ...................................................................................21, 33, 34

*Gray v. City of Valley Park, Mo.,*
  567 F.3d 976 (8th Cir. 2009) ...................................................................................12

*Great Plains Coop v. CFTC,*
  205 F.3d 353 (8th Cir. 2000) ...................................................................................46

*Great Rivers Habitat All. v. FEMA,*
  615 F.3d 985 (8th Cir. 2010) ...........................................................................44, 45

*Harris v. McRae,*
  448 U.S. 297 (1980) ...........................................................................................30, 32

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,*
  182 F.3d 598 (8th Cir. 1999) ...................................................................................52

*Hughes v. City of Cedar Rapids,*
  840 F.3d 987 (8th Cir. 2016) ...................................................................................13

*Hunt v. Wash. State Apple Advertising Comm'n,*
  432 U.S. 333 (1977) ...................................................................................29, 30, 31

*In re Union Pacific R.R. Empl. Practices Litig.,*
  479 F.3d 936 (8th Cir. 2007) ...................................................................................39

*Indep. Equip. Dealers Ass'n v. EPA,*
  372 F.3d 420 (D.C. Cir. 2004) .................................................................................41

*Iowa League of Cities v. EPA,*
   711 F.3d 844 (8th Cir. 2013) ......................................................................... 15, 37

*Iowa Right To Life Comm., Inc. v. Tooker,*
   717 F.3d 576 (8th Cir. 2013) ................................................................................. 25

*Jacksonville Port Auth. v. Adams,*
   556 F.2d 52 (D.C. Cir. 1977) ................................................................................. 54

*Jenkins by Jenkins v. State of Mo.,*
   158 F.3d 984 (8th Cir. 1998) ................................................................................. 15

*Johnson v. v. Vilsack,*
   833 F.3d 948 (8th Cir. 2016) ................................................................................. 43

*Lee v. Schultz,*
   Case No. CIV 14-4117, 2015 WL 1281880 (D.S.D. Mar. 19, 2015) ...................... 41

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,*
   510 F.3d 253 (3d Cir. 2007) .................................................................... 35, 36, 52

*Longshoremen v. Boyd,*
   347 U.S. 222 (1954) ............................................................................................... 22

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010) ................................................................................. 14

*Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................................................. 25

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ............................................................................................... 12

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ............................................................................................... 43

*Missouri Prot. & Advoc. Servs., Inc. v. Carnahan,*
   499 F.3d 803 (8th Cir. 2007) ................................................................................. 29

*Missourians for Fiscal Accountability v. Klahr,*
   830 F.3d 789 (8th Cir. 2016) ................................................................................. 22

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ............................................................................................... 30

*NAACP v. Meese,*
   615 F. Supp. 200 (D.D.C. 1985) ..................................................................... 44, 45

vii

*National Park Hospitality Association v. Department of Interior*,
    538 U.S. 803 (2003) ...........................................................................21, 22, 24

*Nat'l Ass'n of Home Builders v. Norton*,
    415 F.3d 8 (D.C. Cir. 2005) ...........................................................................41

*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*,
    468 F.3d 826 (D.C. Cir. 2006) .......................................................................29

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
    979 F.2d 227 (D.C. Cir. 1992) .......................................................................39

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .......................................................................40

*Nat'l Right to Life Political Action Comm. v. Connor*,
    323 F.3d 684 (8th Cir. 2003) .........................................................................28

*New Doe Child #1 v. United States*,
    901 F.3d 1015 (8th Cir. 2018) .......................................................................36

*New Jersey Hosp. Ass'n v. United States*,
    23 F. Supp. 2d 497 (D.N.J. 1998) .................................................................44

*Newsome v. EEOC*,
    301 F.3d 227 (5th Cir. 2002) .........................................................................17

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................................11

*Novus Franchising, Inc. v. Dawson*,
    725 F.3d 885 (8th Cir. 2013) .............................................................51, 52, 53

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ............................................................... 21, 22, 29, 52

*Olsen v. Mukasey*,
    541 F.3d 827 (8th Cir. 2008) .........................................................................33

*Ouachita Watch League v. United States Forest Serv.*,
    858 F.3d 539 (8th Cir. 2017) .........................................................................30

*Pacific Gas & Elec. Co. v. FPC*,
    506 F.2d 33 (D.C. Cir. 1974) .........................................................................40

*Phelps-Roper v. City of Manchester*,
    697 F.3d 678 (8th Cir. 2012) .........................................................................42

*Powell v. Ryan,*
   855 F.3d 899 (8th Cir. 2017) ........................................................................... 11, 53

*Pratt v. Corr. Corp. of Am.,*
   267 F. App'x 482 (8th Cir. 2008) ............................................................................33

*Princeton Univ. v. Schmid,*
   455 U.S. 100 (1982) ................................................................................................21

*Public Water Supply Dist. No. 10 of Cass Cty. v. City of Peculiar,*
   345 F.3d 570 (8th Cir. 2003) ..................................................................................23

*R.A.V. v. St. Paul,*
   505 U.S. 377 (1992) ................................................................................................37

*Raines v. Byrd,*
   521 U.S. 811 (1997) ................................................................................................11

*Religious Sisters of Mercy v. Azar,*
   513 F. Supp. 3d 1113 (D.N.D. 2021) .............................................................*passim*

*Renne v. Geary,*
   501 U.S. 312 (1991) ................................................................................................28

*Rhea Lana, Inc. v. Dep't of Labor,*
   824 F.3d 1023 (D.C. Cir. 2016) ..............................................................................40

*Roberts v. Colo. State Bd. of Agric.,*
   998 F.2d 824 (10th Cir. 1993) ................................................................................53

*Robinson v. Dignity Health,*
   Case No. 16-cv-3035, 2016 WL 3153023 (N.D. Cal. Dec. 6, 2016) ......................54

*Rodgers v. Bryant,*
   942 F.3d 451 (8th Cir. 2019) ..................................................................................19

*Rogers v. Windmill Pointe Vill. Club Ass'n,*
   967 F.2d 525 (11th Cir. 1992) ................................................................................53

*Rude v. Laughing Sun Brewing Co.,*
   Case No. 1:20-CV-029, 2020 WL 1073958 (D.N.D. Mar. 5, 2020) .......................45

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
   547 U.S. 47 (2006) ..................................................................................................37

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.,*
   696 F.3d 771 (8th Cir. 2012) ..................................................................................51

*Saint Marys Hosp. of Rochester, Minnesota v. Leavitt,*
   535 F.3d 802 (8th Cir. 2008) ..................................................................................50

*Sampson v. Murray,*
   415 U.S. 61 (1974) ...............................................................................................51

*Sch. Dist. of Abington Twp., Pa. v. Schempp,*
   374 U.S. 203 (1963) .............................................................................................30

*Sch. Dist. of City of Saginaw v. Dep't of Health, Ed., & Welfare,*
   431 F. Supp. 147 (E.D. Mich. 1977) ...................................................................46

*Shalala v. Guernsey Mem'l Hosp.,*
   514 U.S. 87 (1995) ...............................................................................................39

*Sharpe Holdings, Inc. v. Health & Human Servs.,*
   801 F.3d 927 (8th Cir. 2015); *vacated on other grounds,*
   *Dep't of Health & Human Servs. v. CNS Int'l Ministries,* No. 15-775 (2016) ...........................................32

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
   251 F.3d 814 (9th Cir. 2001) ...............................................................................53

*Standing Rock Hous. Auth. v. EEOC,*
   585 F. Supp. 2d 1112 (D.N.D. 2008) ..........................................................23, 42

*State of Mo. ex rel. Missouri Highway & Transp. Comm'n v. Cuffley,*
   112 F.3d 1332 (8th Cir. 1997) .......................................................................16, 28

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .............................................................................................30

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ...........................................................................12, 14, 26, 27

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021) .........................................................................................36

*Taylor v. Cohen,*
   405 F.2d 277 (4th Cir. 1968) ...............................................................................46

*Temple Univ. of Commonwealth Sys. of Higher Educ. ex rel. v. Brown,*
   Case No. CIV. A. 00-CV-1063, 2001 WL 185535 (E.D. Pa. Feb. 23, 2001) ....................................44

*Texas Children's Hosp. v. Burwell,*
   76 F. Supp. 3d 224 (D.D.C. 2014) .......................................................................40

*Texas v. United States*,
    523 U.S. 296 (1998) ........................................................................................... 15, 22, 39

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ........................................................................... 14, 16, 17

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ................................................................................................ 45, 46

*Toilet Goods Ass'n v. Gardner*,
    387 U.S. 158 (1967) ........................................................................................................ 22

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995); *cert. denied*, 527 U.S. 1036 (1999) ................................. 53

*Travis v. Pennyrile Rural Elec. Co-op.*,
    399 F.2d 726 (6th Cir. 1968) ......................................................................................... 52

*Travis v. Perdue*,
    Case No. 3:20-05071-CV-RK, 2021 WL 328916 (W.D. Mo. Feb. 1, 2021) .................... 45

*Trump v. New York*,
    141 S. Ct. 530 (2021) ....................................................................................... 14, 17, 25

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) .......................................................................................... 38, 42

*U.S. Steel Corp. v. Fri*,
    364 F. Supp. 1013 (N.D. Ind. 1973) ............................................................................. 44

*United Food & Commercial Workers International Union v. IBP, Inc.*,
    857 F.2d 422 (8th Cir. 1988) ......................................................................................... 19

*United Pub. Workers of Am. v. Mitchell*,
    330 U.S. 75 (1947) .................................................................................................. 14, 22

*United States v. Gates*,
    915 F.3d 561 (8th Cir. 2019) ......................................................................................... 20

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ........................................................................................................ 32

*Von Aulock v. Smith*,
    720 F.2d 176 (D.C. Cir. 1983) ................................................................................. 20, 40

*Walker v. Azar*,
    480 F. Supp. 3d 417 (E.D.N.Y. 2020) ....................................................................... 8, 26

*Wallace v. ConAgra Foods, Inc.,*
   747 F.3d 1025 (8th Cir. 2014) ........................................................................27

*Watkins Inc. v. Lewis,*
   346 F.3d 841 (8th Cir. 2003) ..........................................................................11

*Whitman-Walker Clinic, Inc. v. Dep't of Health & Human Servs.,*
   485 F. Supp. 3d 1 (D.D.C. Sept. 2, 2020) ................................................ 8, 26

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008) ...............................................................................31, 32, 51

*Wright v. Dominguez,*
   Case No. 04-5055, 2004 WL 1636961 (D.C. Cir. July 21, 2004) ..................45

*Zemel v. Rusk,*
   381 U.S. 1 (1965) ............................................................................................22

**Statutes**

5 U.S.C. § 551 ...........................................................................................................50

5 U.S.C. § 704 ...................................................................................................37, 43

5 U.S.C. § 706 ...........................................................................................................47

20 U.S.C. § 1681 ................................................................................................. 5, 34

20 U.S.C. § 1682 ................................................................................................*passim*

20 U.S.C. § 1683 ................................................................................................. 6, 43

42 U.S.C. § 300 ...................................................................................................50, 51

42 U.S.C. § 2000 ...............................................................................................*passim*

42 U.S.C. § 18114 .....................................................................................................50

42 U.S.C. § 18116 .........................................................................................5, 34, 43

42 U.S.C. §§ 4140 ....................................................................................................45

**Rules**

Fed. R. Civ. P. 65 ....................................................................................................31

**Regulations**

29 C.F.R. §§ 1601.27-1601.29 .......................................................................44

45 C.F.R. § 80.6-80.8 ...........................................................................5, 34, 43

45 C.F.R. § 80.8 .........................................................................................6

45 C.F.R. § 92.5(a) ....................................................................................5

EEOC's Compliance Manual on Religious Discrimination,
   Directive 915.063, § 12 (Jan. 15, 2021)......................................13, 15, 48

*Nondiscrimination in Health Programs and Activities of 2016,*
   81 Fed. Reg. 31,376 (May 18, 2016)..............................................6, 19

*Nondiscrimination in Health and Health Education Programs or Activities of 2019,*
   84 Fed. Reg. 27,846 (proposed June 14, 2019) ...............................7 , 50

*Nondiscrimination in Health and Health Education Programs or Activities of 2020,*
   85 Fed. Reg. 37,160 (June 19, 2020) ......................................7, 8, 49, 50

*Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972,*
   86 Fed. Reg. 27,984 (May 25, 2021).............................................*passim*

Preventing and Comabting Discrimination on the Basis of Gender Identity
or Sexual Orientation, Exec. Order 13988,
    86 Fed. Reg. 7023 (May 18, 2016) .................................................4

**Other Authorities**

Chandler Regional Medical Center, *About Us,*
   https://perma.cc/WP9L-AFDY ...................................................18

Edwards, Elliott, & Levy,
   Federal Standards of Review 157 (2d ed. 2013)...............................39

EEOC, *Title VII of the Civil Rights Act of 1964 Charges,*
   https://go.usa.gov/x6bED .........................................................16

EEOC, *EEOC Litigation Statistics, FY 1997 through FY 2020,*
   https://go.usa.gov/x6bmB..........................................................16

## INTRODUCTION

Plaintiff Christian Employers Alliance ("CEA") asks this Court to preliminarily enjoin the Equal Employment Opportunity Commission ("EEOC") from mandating that CEA's members cover gender-transition services in their employee healthcare plans, and to further preliminarily enjoin the Department of Health and Human Services ("HHS") from mandating that CEA's members who are healthcare providers perform such gender-transition services. But CEA's request begins from a false premise—neither agency actually imposes such a mandate on religious employers or healthcare providers. Tellingly, CEA cannot point to a *single* instance where either agency has enforced such a "mandate," nor can it identify any operative agency rules or guidance reflecting these so-called "universal gender identity mandates." ECF No. 6-1 ("PI Mem.") at 1.

To be sure, both agencies have made clear that the respective sex discrimination statutes they enforce extend to gender-identity discrimination. But that is little more than an application of the Supreme Court's reasoning last year that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020). Neither agency has issued regulations or even guidance stating that the specific policies and actions identified by CEA fall within the scope of unlawful gender-identity discrimination. And both affirm that the Religious Freedom Restoration Act ("RFRA") and other religious defenses may overcome a charge of discrimination on a case-by-case basis. The Supreme Court itself cautioned that determining what "policies and practices" qualify as gender-identity discrimination, as well as how that proscription interacts with religious liberty laws, posed questions for "future cases." *Id.* at 1753-1754.

But this is not that future case—CEA does not present a concrete dispute between one of its member's practices or beliefs and the agencies' enforcement actions; instead it seeks only to enjoin how EEOC and HHS *might* interpret their anti-discrimination laws in the future and then *might* choose to enforce them against CEA members. Such a conjectural theory of harm does not supply jurisdiction to grant CEA's broad request for preliminary relief, as CEA's claims cannot be evaluated in the abstract. While another district court concluded otherwise, its decision—which will soon be heard on

appeal—exceeded the boundaries of Article III jurisdiction, enjoining EEOC and HHS from enforcing their relevant anti-discrimination statutes based on positions those agencies had not actually adopted.  Federal courts are not empowered to grant such advisory opinions.

Plaintiff's speculative theory of harm means that it cannot meet any of the four well-settled *Dataphase* factors for a preliminary injunction.  CEA has no likelihood of success on the merits, first, because this Court lacks subject-matter jurisdiction over its challenge to enjoin hypothetical future agency enforcement activity.   Article III limits federal court jurisdiction to concrete cases or controversies, but CEA suffers from no present or certainly impending injury sufficient to give rise to such a dispute.  Plaintiff may not simply ascribe a position to EEOC or HHS that neither agency has taken, claim an injury, and then seek to enjoin enforcement theories that the agencies may not adopt, never mind pursue against a CEA member.  CEA's claims are unripe for similar reasons.  Its theory of harm is contingent on future events that may never occur, or may play out differently than anticipated.  The Court cannot prematurely assess Plaintiff's necessarily fact-specific claims without the benefit of a factual record.  Moreover, the speculative claim of harm here means that CEA's members face no hardship in forestalling review until an actual application of the anti-discrimination laws exists to consider.  Indeed, CEA's abstract claim of harm is compounded by its own failure to identify any of its members, or to present evidence that any of its members have actually been burdened, or face irreparable harm, from the so-called mandates.  CEA therefore has not shown that it possesses associational standing to assert claims on behalf of its anonymous members.

Beyond the catalogue of Article III deficiencies with CEA's challenge, its claims are not likely to succeed on their own terms.  The Religious Freedom Restoration Act ("RFRA") calls for an individualized inquiry into whether a particular person's religious practice has been substantially burdened by the Government.  But no such "person" or "practice" has been identified in the case. And regardless, CEA's abstract and contingent dispute with EEOC and HHS fails to show a substantial burden on anyone's religious practice, particularly given both agencies' affirmation that any future decisions about whether to file any enforcement actions will account for RFRA and other religious defenses.  Plaintiff's related First Amendment claims, which are largely duplicative of the

RFRA claims, are unlikely to succeed on the merits for similar reasons.

CEA also fails to overcome numerous threshold requirements to assert an Administrative Procedure Act ("APA") claim.  It does not identify any final agency action in this case; indeed, it does not even allege that the "mandates" are final agency action.  Instead it largely points to various agency guidance, policy statements, and interpretive rules, but these agency materials lack the force of law and do not qualify as final agency action.  Further still, both anti-discrimination statutes that CEA takes umbrage with provide for *de novo* judicial review of its arguments within the context of actual enforcement proceedings, meaning that CEA's members have an adequate and alternative remedy to this suit.  The APA precludes pre-enforcement challenges in such instances.  Even if CEA had overcome these hurdles, it fails to show either EEOC or HHS has acted in a manner contrary to law. Plaintiff's arguments on that point make clear that its true quarrel is with the Supreme Court's decision in *Bostock*, and not with non-binding agency guidance that merely reiterates that decision's reasoning.

The remaining *Dataphase* factors also strongly weigh against preliminary relief.  CEA offers next to no explanation of how its members face irreparable harm, and in view of its highly attenuated theory of injury, such irreparable harm is lacking here.  Further, because CEA members would have the opportunity to present the same arguments here in any future administrative proceeding, followed by *de novo* judicial review, declining to resolve such arguments now poses no *irreparable* harm to them. CEA's own delay in seeking relief until long after it alleges the so-called mandates came to exist also casts doubt on its claim of irreparable harm.  Finally, weighing CEA's lack of imminent harm against the disruption its broad request for relief would impose on the nation's anti-discrimination laws, the balance of the equities and public interest factors also weigh in favor of denying Plaintiff's motion.

## BACKGROUND

### I.  Statutory and Regulatory Background

#### A.    Title VII's prohibition on sex discrimination and EEOC.

Title VII's private sector provision prohibits employment discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1).  EEOC is tasked with investigating claims of unlawful employment discrimination, including sex discrimination, under Title VII.  *See generally* 42 U.S. § 2000e-5.

Employees or job applicants who allege that they have been subject to an unlawful employment practice by an employer subject to Title VII may file a charge with EEOC. *Id.* § 2000e-5(b). EEOC will then investigate the claim and if, after completing its investigation, it determines that "there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the [employer] of its action." *Id.* The notice to the employee or applicant is typically referred to as a "notice of right to sue" because the employee or applicant can file suit only after she receives the notice. *Id.* § 2000e-5(f)(1). If, however, EEOC concludes that there is reasonable cause to believe that an employer violated Title VII, it initiates conciliation, a process by which the agency attempts to facilitate a settlement agreement between the claimant and the employer. *Id.* If conciliation fails, EEOC "may" bring its own enforcement action against a private employer or issue a right to sue notice allowing the claimant to sue. *Id.* In either event, the ensuing review is *de novo*. *See Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 325 (1980).

Even prior to *Bostock*, EEOC has taken the position that discrimination "because of . . . sex" under Title VII includes discrimination because of gender identity. The Supreme Court agreed last year in *Bostock*. In the wake of that decision, President Biden ordered agencies to review their interpretations of sex-discrimination laws. *See* Exec. Order 13988, 86 Fed. Reg. 7023 (Jan. 20, 2021). On June 15, 2021, the EEOC issued a technical assistance document addressing Title VII's prohibitions against sexual orientation and gender-identity discrimination in the workplace. *See* ECF No. 1 ("Compl.") ¶ 82, *id.* Ex. 4 ("EEOC Document"). The EEOC first summarized the Supreme Court's decision in *Bostock*. *Id.*, Ex. 4 at 2. It then explained EEOC's "established legal positions on LGBTQ+ related matters, as voted by the Commission." *Id.* It stated that in 2012 EEOC had, prior to *Bostock*, already taken the view that Title VII prohibits gender-identity discrimination, and, in 2015, further concluded that it prohibits sexual orientation discrimination. *Id.*

The EEOC Document stressed that it was not providing any "new policy" and further that the document did "not have the force and effect of law and is not meant to bind the public in any way." EEOC Document at 4. Instead it was "intended only to provide clarity to the public regarding existing requirements" under Title VII. *Id.* The document also did not purport to dictate the outcome

of an enforcement action under any particular set of facts.  It noted that Title VII permits religious organizations and religious educational institutions to hire and employ people who share their own religion, and also recognized the "ministerial exception" that "bars certain employment discrimination claims by the employees of religious institutions." *Id.* at 5.  But, consistent with the broader document, it explained that the applicability of these exceptions is determined "on a case by case basis" and that "defenses might also be available to employers depending on the facts of a particular case." *Id.*

While EEOC has taken the position that gender-identity discrimination constitutes sex discrimination under Title VII, and restated that view in the EEOC Document, it has to date never filed an enforcement action in court challenging an employer's exclusion of gender-transition services from its health plan, much less filed such an action where an employer raised a religious defense.

## B.    Section 1557, Title IX, and HHS.

Section 1557 of the Affordable Care Act states that no individual shall be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under" a covered federally funded health program or activity on the grounds in several long-standing civil rights laws, including Title IX of the Education Amendments of 1972.  42 U.S.C. § 18116(a) (citing 20 U.S.C. § 1681).  Title IX, in turn, prohibits discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  Section 1557 thus provides that "an individual shall not [on the basis of sex] be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in covered federally funded health programs.  42 U.S.C. § 18116(a).

Section 1557 also incorporates the "enforcement mechanisms provided for and available under" the civil rights laws it cites, including Title IX.  42 U.S.C. § 18116(a); *see also* 45 C.F.R. § 92.5(a). These enforcement mechanisms, including Title IX's, permit an enforcing agency—here, HHS and its Office for Civil Rights—to terminate, or refuse to grant, federal funds to entities that discriminate on the basis of sex.  *See, e.g.*, 20 U.S.C. § 1682; *see also* 45 C.F.R. § 80.6-80.8.  But the enforcing agency must take several steps before withholding federal funds.  First, it must "advise[] the appropriate person or persons of the failure to comply with the requirement" not to discriminate because of sex and "determine[] that compliance cannot be secured by voluntary means."  20 U.S.C. § 1682.  If the

party does not voluntarily comply, HHS may withhold funding only after "there has been an express finding on the record, after opportunity for hearing, of a failure to comply" with Title IX.  *Id.*  The agency then must inform the appropriate Congressional committees of the grounds for its action.  *Id.*  A party aggrieved by this administrative process may obtain "judicial review as may otherwise be provided by law" or "in accordance with chapter 7 of Title 5," *i.e.*, the APA.  *Id.* § 1683; *see id.* § 1682 (further providing for enforcement "by any other means authorized by law," including referral to the Department of Justice with a recommendation for proceedings under 45 C.F.R. § 80.8).

### C.   HHS's prior rulemaking under § 1557.

#### 1.   *The 2016 Rule and related litigation.*

In 2016, HHS promulgated a rule prohibiting discrimination on the basis of sex in covered health care programs or activities.  *See Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,376 (May 18, 2016) ("2016 Rule").  The rule defined sex discrimination to include, as relevant here, gender-identity discrimination.  *Id.* at 31,467.  It explained, for example, that a covered provider could not refuse to offer medical services for gender transitions if the provider offered comparable services to those not seeking gender transition.  *Id.* at 31,471.  Thus, a "provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals."  *Id.* at 31,455.

The rule did not permit enforcement that "would violate applicable Federal statutory protections for religious freedom and conscience," *id.* at 31,466, and it further explained that RFRA "is the proper means to evaluate any religious concerns about the application of Section 1557 requirements," *id.* at 31,380.  The 2016 Rule stated that HHS would evaluate "individualized and fact specific" RFRA claims "on a case-by-case basis."  *Id.*  The 2016 Rule's prohibition on gender-identity discrimination was preliminary enjoined on a nationwide basis later in 2016.  *See Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660, 694 (N.D. Tex. 2016).[1]  Prior to this litigation, the same court granted

---

[1] Several similar challenges to the 2016 rule were also filed in this district.  *See Religious Sisters of Mercy v. Burwell*, Case No. 3:16-cv-386, ECF No. 1 (D.N.D. Nov. 7, 2016); *Catholic Benefits Assoc. v. Burwell*,

summary judgment to the plaintiffs and vacated, as relevant here, the 2016 Rule's prohibition on gender-identity discrimination.  *See Franciscan Alliance v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019).[2]

### 2.    *The 2020 Rule and related litigation.*

In 2019, while the 2016 Rule remained preliminarily enjoined, HHS issued a Notice of Proposed Rulemaking indicating that it intended to revise the 2016 Rule.  *See Nondiscrimination in Health and Health Education Programs or Activities*, 84 Fed. Reg. 27,846 (proposed June 14, 2019) ("NPRM"). The NPRM indicated that HHS intended to repeal the 2016 Rule's definition of discrimination "on the basis of sex" altogether.  But the notice also observed that the Supreme Court had granted several petitions for certiorari to determine whether Title VII's bar on sex discrimination included gender identity and sexual orientation discrimination.  *Id.* at 27,855.  HHS acknowledged the likely consequence of the Supreme Court's decision to its own interpretation of Title IX because "Title IX adopts the substantive and legal standards of Title VII."  *Id.*  Rather than propose a new definition of discrimination "on the basis of sex," HHS indicated it would permit the federal courts to supply the term's "proper legal interpretation."  *Id.* at 27,873.

Despite this acknowledgement of the pending Supreme Court cases, shortly before the Supreme Court's decision in *Bostock*, HHS released its new rule.  *See Nondiscrimination in Health and Health Education Programs or Activities*, 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Rule").  As Plaintiff acknowledges, and consistent with the NPRM, the 2020 Rule rescinded the 2016 Rule's definition of "on the basis of sex."  *Id.* at 37,167; *see* PI Mem. at 8 (acknowledging that HHS "repealed the definition of sex as including gender identity").  The 2020 Rule gave no supplemental definition for that term

---

3:16-cv-432, ECF No. 1 (D.N.D. Dec. 28, 2016).  The district court consolidated those cases and stayed enforcement of the 2016 rule against the named plaintiffs.  *See Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1127 (D.N.D. 2021) ("*RSM*").

[2] More recently, and as relevant here, the court that originally preliminarily enjoined the gender-identity discrimination provision of 2016 Rule entered a permanent injunction prohibiting HHS "from interpreting or enforcing Section 1557 . . . or any implementing regulation thereto against Plaintiffs . . . in a manner that would require them to perform or provide insurance coverage for gender-transition procedures or abortions."  *See generally Franciscan All., Inc. v. Becerra*, No. 7:16-CV-00108-O, 2021 WL 3492338, at *5 (N.D. Tex. Aug. 9, 2021).  The government filed an interlocutory appeal of that order on November 22, 2021.  *See Franciscan All., Inc. v. Becerra*, Case No. 7:16-CV-108-0, ECF No. 212.

beyond Title IX's statutory text. The rule's preamble further omitted the specific examples of discriminatory conduct supplied by the 2016 Rule's preamble, including its example about gender-transition services. *Id.* at 37,201. And it further explained that HHS did not believe either § 1557 or Title IX prohibited gender-identity discrimination. The 2020 Rule also expressly incorporated Title IX's existing statutory exemption for educational institutions controlled by religious organizations, in addition to acknowledging that RFRA and any similar laws would apply under § 1557. *Id.* at 37,204.

The Supreme Court issued its decision in *Bostock* three days after HHS published the 2020 Rule, holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Shortly thereafter, several courts concluded that the 2020 Rule likely violated the APA because it did not appropriately consider *Bostock* prior to issuance. As relevant here, one district court enjoined the repeal of the 2016 definition of sex discrimination and of provisions implementing that definition to prohibit the denial of medical procedures based on gender identity, but stated that it could not overturn the earlier vacatur of the gender identity language by the *Franciscan Alliance* district court. *See Walker v. Azar*, 480 F. Supp. 3d 417, 427 (E.D.N.Y. 2020). A second district court issued a preliminary injunction enjoining the repeal of "sex stereotyping" language in the 2016 definition of sex discrimination, and further enjoining the 2020 Rule's incorporation of Title IX's statutory religious exemption. *See Whitman-Walker Clinic, Inc. v. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 64-65 (D.D.C. Sept. 2, 2020). Both district courts acknowledged that their orders did not disturb the *Franciscan Alliance* district court's 2019 vacatur of the 2016 Rule's definition of sex discrimination that incorporated gender-identity discrimination. *See Whitman-Walker*, 485 F. Supp. 3d 1, 14 (acknowledging *Franciscan Alliance* vacatur); *Walker*, 480 F. Supp. 3d 417, 427 (same). The 2020 Rule remains in effect subject to these two preliminary injunctions.[3]

---

[3] HHS appealed each of the two preliminary injunctions on the 2020 rule but has since stipulated to dismissal in both appeals. *See Walker v. Becerra*, No. 20-3580 (2d Cir. filed Oct. 16, 2020); *Whitman-Walker Clinic v. HHS*, No. 20-5331 (D.C. Cir. filed Nov. 9, 2020).

3.      *The 2021 Notification.*

On May 10, 2021, in response to the President's Executive Order, HHS issued a document titled *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972. See* Compl. ¶ 116; *see also* 86 Fed. Reg. 27,984 (May 25, 2021) ("Notification"). The Notification explained that it was intended to "inform the public" that "consistent with the Supreme Court's decision in *Bostock* and Title IX," HHS "will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." *Id.* at 27,984. The Notification did not take any position on the meaning or scope of discrimination on the basis of sexual orientation or gender identity, nor did it provide examples of such impermissible conduct. Instead it states that while the "interpretation will guide [the Office for Civil Rights] in processing complaints and conducting investigations, [it] does not itself determine the outcome in any particular case or set of facts." *Id.* Indeed, the Notification does not say *anything* about enforcement proceedings in any particular case or set of facts.

To further support its interpretation of § 1557 and Title IX, the Notification explains that the Supreme Court's decision in *Bostock* held that "the plain meaning of 'because of sex' in Title VII necessarily included discrimination because of sexual orientation and gender identity." 86 Fed. Reg. at 27,985 (citing *Bostock*, 140 S. Ct. at 1753-1754). It observed that several courts had since concluded that the plain language of Title IX—which bars discrimination "on the basis of sex"—must be read similarly. *Id.* And, further, the Notification cited an interagency memorandum from the Civil Rights Division of the Department of Justice concluding that the reasoning of *Bostock* applies with equal force to Title IX. *Id.* Finally, the Notification states that HHS "will comply with the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, and all other legal requirements," including "all applicable court orders that have been issued in litigation involving the Section 1557 regulations." *Id.*

## II.      Plaintiff And This Litigation

Plaintiff in this case is Christian Employers Alliance, a Christian membership ministry comprised of non-profit and for-profit employers. *See* Compl. ¶ 21. The complaint does not identify

any specific CEA members.  Instead, it merely alleges the organization has members, including "multiple members that are principally engaged in the business of providing healthcare and that receive Federal financial assistance" for such services.  *Id.* ¶¶ 48-49.  The complaint further alleges that many CEA members "employ more than 15 employees" and therefore qualify as employers subject to Title VII.  *Id.* ¶ 51.  CEA alleges that its members are required to hold certain religious beliefs regarding gender and sex, including that male and female are immutable characteristics and that gender reassignment surgery is contrary to Christian values.  *Id.* ¶¶ 30-34; *id.*, Ex. 1.

CEA alleges that "for almost 10 years," EEOC has interpreted Title VII to prohibit gender-identity discrimination, and that EEOC correspondingly requires all employers with 15 or more employees, including unidentified CEA members, to provide health plans that pay for and provide gender-transition services.  Compl. ¶¶ 63-65, 67, 71.  CEA dubs this the "EEOC Coverage Mandate." *Id.* ¶¶ 56-85.  Similarly, CEA alleges that HHS's interpretation of § 1557 requires CEA's unidentified healthcare provider members to perform a litany of specific procedures related to gender transition. *See id.* ¶ 123.  CEA labels this the "HHS Gender Identity Mandate."  *Id.* ¶¶ 122-123.

Although it does not identify any instance where either EEOC or HHS has enforced their so-called mandates, CEA claims that each mandate compels various unidentified subsets of its members to violate sincerely held religious beliefs or face the prospect of enforcement.  *See* Compl. ¶15. Accordingly, CEA brings RFRA and First Amendment Free Exercise Clause claims against both EEOC and HHS on behalf of its unidentified members.  *Id.* ¶¶ 152-222 (claims I-IV).  It brings a First Amendment Free Speech Clause claim against HHS specifically, alleging that the so-called HHS Gender Identity Mandate both compels and chills speech regarding gender-transition services.  *Id.* ¶¶223-240 (claim V).  And finally, it brings an APA claim against all Defendants alleging the so-called mandates are arbitrary and capricious, and contrary to law.  *Id.* ¶¶ 241-273 (claim VI).

CEA frames these claims as asking for no more than what certain other religious plaintiffs recently received from another court within this District.  *See RSM*, 513 F. Supp. 3d 1113, 1127 (D.N.D. 2021).  That court concluded the plaintiffs there had standing to pursue RFRA claims concerning hypothetical future enforcement actions, and that such claims were ripe despite the

absence of any factual record. *Id.* And it further concluded the plaintiffs faced a credible risk of enforcement, despite the lack of any prior or threatened future enforcement based on the theories identified by the plaintiff in that case. *Id.* at 1141. While CEA insists this decision forces the Court's hand here, CEA's claims sweep more broadly than those in *RSM*, yet CEA has made no corresponding showing of irreparable harm that would warrant such broad preliminary relief. Just as significantly, Defendants respectfully disagree with the decision in *RSM*, which itself is scheduled for oral argument before the Eighth Circuit only days after the instant motion becomes fully briefed.

## LEGAL STANDARD

"A district court considering injunctive relief evaluates the movant's likelihood of success on the merits, the threat of irreparable harm to the movant, the balance of the equities between the parties, and whether an injunction is in the public interest." *Powell v. Ryan*, 855 F.3d 899, 902 (8th Cir. 2017) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). The final two factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). No one factor is dispositive, and while success on the merits is ordinarily the most important, *e.g.*, *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011), "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction," *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The burden to demonstrate the necessity of injunctive relief rests with the movant. *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009).

## ARGUMENT

I.   **The Court Lacks Subject-Matter Jurisdiction Over CEA's Challenge To Hypothetical Future Enforcement Actions And CEA Therefore Cannot Prevail On The Merits**

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted). The case-or-controversy inquiry is "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was" unlawful. *Raines v. Byrd*, 521 U.S. 811, 819-820 (1997); *see also Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("When the federal

judicial power is invoked to pass upon the validity of actions by the Legislative and Executive Branches of the Government, the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III."). In order to effectuate the Constitution's command, the Supreme Court has developed the doctrines of standing and the similar constitutional prerequisites to the exercise of jurisdiction—mootness and ripeness. *See Gray v. City of Valley Park, Mo.*, 567 F.3d 976 (8th Cir. 2009). These doctrines often overlap in practice because they "all originate in Article III's 'case' or 'controversy language.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted).

CEA's claims against both agencies fail to meet the requirements of Article III for several reasons, beginning with standing. To establish standing under Article III, a plaintiff must allege that it has suffered a concrete injury, or that such an injury is "imminent" or "certainly impending." *Clapper*, 568 U.S. at 409. "Allegations of *possible* future injury are not sufficient." *Id.* (cleaned up) (emphasis in original). Plaintiffs cannot establish an Article III injury where their alleged harm is merely "conjectural" or "hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*SBA List*) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

CEA fails to allege that it faces an imminent or certainly impending injury from either EEOC or HHS. Instead, its complaint quarrels with the fact that those agencies, at a general level, now both read their respective anti-discrimination statutes—Title VII and § 1557—to prohibit gender-identity discrimination, consistent with the Supreme Court's reasoning in *Bostock*. But that abstract disagreement is not sufficient to supply an Article III injury. Searching to find a sufficient injury to sustain their premature challenge, CEA contends that its members face imminent enforcement risk from two so-called "mandates" that require those members to provide their employees with health insurance covering gender-transition services and, for its members who are healthcare providers, to actually perform or facilitate gender transition services. *See generally* Compl. ¶¶ 1-5.

These made-for-litigation "mandates" do not exist. Tellingly, CEA does not point to any instance where either agency has ever enforced their respective anti-discrimination laws in the manner it describes. And, in fact, neither EEOC nor HHS *has* enforced Title VII or § 1557 in the way CEA

alleges against any employer or healthcare provider, much less against CEA's members or other religious employers and healthcare providers who assert RFRA or other religious defenses. Indeed, the agency materials that CEA challenges, such as the HHS Notification and EEOC Document, stress that any future enforcement action based on gender-identity discrimination will be fact-specific and account for all relevant religious-practice exemptions, as well as RFRA. *See* EEOC Document at 5; HHS Notice at 86 Fed. Reg. at 27,985. The same materials make no reference at all to the gender-transition procedures or services that CEA lists in the complaint.

CEA's theory of harm therefore boils down to this: that at some unspecified time in the future, EEOC or HHS *might* choose to enforce § 1557 or Title VII in the manner ascribed to them by CEA; that they *might* then also receive a complaint or have cause to investigate one of CEA's members for violating that prospective interpretation of law; and, further, that the agencies *might* then exercise their discretion to bring enforcement actions seeking to compel one of CEA's members to perform, or and provide insurance coverage for, a specific gender-transition service. And, to boot, CEA simply assumes that the agencies also will wrongly reject any religious defense that employer or provider raises at that time. Such speculation fails to supply an Article III case or controversy—CEA may not simply ascribe a hypothetical enforcement position to EEOC and HHS and then seek to enjoin such enforcement. *See Agred Found. v. United States Army Corps of Engineers*, 3 F.4th 1069, 1074-1075 (8th Cir. 2021) (finding claimed pre-enforcement injury "speculative and not imminent" where agency "refused to take a position" regarding plaintiff's conduct); *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 992 (8th Cir. 2016) (plaintiff did not have standing to challenge city's use of traffic cameras where plaintiff asserted fear of enforcement against him but had not received a notice of violation).[4]

CEA's generalized claim that its unidentified members wish to engage in conduct that might

---

[4] CEA's claim of harm is all the more speculative because it fails to identify a single one of its members, frustrating the Court's ability to make any concrete assessment of whether any particular CEA member *actually* has suffered a particularized injury, or faces any *imminent* irreparable harm warranting injunctive relief. For that reason, CEA has not plausibly alleged that it has organizational standing to sue on behalf of its anonymous present and future members. *See infra* Argument § I.C.

arguably violate federal law does not confer Article III standing.  *See, e.g.*, *Clapper*, 568 U.S. at 410; *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000).  That is because "[i]n the absence of contemporary enforcement . . . a plaintiff claiming standing must show that the likelihood of future enforcement is 'substantial.'" *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (quoting *SBA List*, 573 U.S. at 164); *see also Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (holding that "'general threats by officials to enforce those laws which they are charged to administer' do not 'create the necessary injury in fact" absent a more particularized basis for the plaintiff to fear enforcement (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 88 (1947)) (cleaned up).  CEA cannot make that showing because neither agency has taken the position CEA ascribes to them, nor pursued enforcement of such theories in the past.

To be sure, such a pre-enforcement challenge may be appropriate where an identifiable plaintiff has already been subject to enforcement.  *See SBA List*, 573 U.S. at 158.  But that is not the case here—CEA does not (and cannot) allege that *anyone*, never mind one of its members, has previously been subject to enforcement for failing to offer insurance covering gender-transition services, or refusing to perform such services.  Nor do Title VII and § 1557's general prohibitions on gender-identity discrimination compel the conclusion that such conduct constitutes discrimination irrespective of the factual context, or that EEOC and HHS would choose to pursue enforcement for such discrimination, particularly where a defendant may assert plausible religious-practice defenses.  Indeed, CEA's theory of harm is significantly undercut by the fact that it alleges that EEOC has taken the position for *nearly a decade* that failing to offer gender-transition service coverage violates Title VII, Compl. ¶ 64, yet cannot point to a single instance where the agency has actually filed an enforcement action on this basis.  *Cf. Clapper*, 568 U.S. at 411 (plaintiffs' theory of standing was "substantially undermine[d]" by their "fail[ure] to offer any evidence that their communications ha[d] been monitored" under the challenged statute).

CEA's claims are unripe for substantially the same reason.  Claims are not ripe if they depend on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 141 S. Ct. 530, 535 (2021) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  At

this stage, EEOC and HHS have done nothing more than explain to the public that Title VII and §1557 prohibit gender-identity discrimination by those covered by those laws.  The factual contours of any future enforcement action are therefore hypothetical. And it may well be the case that neither agency *ever* enforces its respective anti-discrimination statute in the manner CEA alleges; indeed, neither has in the past.  *Cf. Iowa League of Cities v. EPA*, 711 F.3d 844, 866 n.15 (8th Cir. 2013) (explaining that agency action becomes ripe for judicial review "when agencies veer from merely advisory statements or interpretations into binding proclamations").  And it may be the case that neither agency ever initiates an enforcement action against CEA members, particularly after becoming aware of their claimed religious beliefs.  CEA is therefore "asking for an advisory opinion concerning its predicament should certain facts come about." *Jenkins by Jenkins v. State of Mo.*, 158 F.3d 984, 986 (8th Cir. 1998).  But that "is a thicket [courts] should not enter." *Id.*  Finally, should the agencies actually pursue enforcement actions against a CEA member, that entity will be able to present its full slate of constitutional and statutory defenses and, if necessary, in *de novo* judicial review based on a complete factual record.

### A.     CEA has failed to demonstrate standing and ripeness for its challenge to EEOC's future enforcement of Title VII.

#### 1.     *Plaintiff has not pled an injury traceable to EEOC.*

CEA does not allege that EEOC has ever initiated a Title VII enforcement action against one of its members for failing to cover gender-transition services under an employee health plan.  Any alleged harm to a CEA member from EEOC therefore relies upon a string of hypotheticals—(1) that an employee of a CEA member will seek gender-transition services; (2) that the employee will file a charge of discrimination with EEOC based on the denial of such insurance coverage; (3) that EEOC will find reasonable cause to believe that gender discrimination occurred based on all the facts and circumstances involved; (4) that EEOC's attempt at voluntary conciliation with the employer will fail; and (5) that EEOC will exercise its discretion to pursue enforcement against such an employer, regardless of any religious defense.  CEA has not adequately alleged that *any* of these events is likely

**Defendants' Opp. to PI Motion – Page 15**

to occur, never mind that *all* of them will.[5]  Federal courts are "neither required nor empowered to wade through a quagmire of what-ifs like" CEA's.  *State of Mo. ex rel. Missouri Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1338 (8th Cir. 1997).  Indeed, CEA's failure to allege that *any* of its members have had, or imminently will have, an employee seek gender-transition services under an employer health insurance plan should prove fatal to any claim of standing.  *See Thomas*, 220 F.3d at 1139-1140 (landlords who refused to rent to unmarried couples on religious grounds did not have standing to challenge nondiscrimination law where landlords could not identify any tenants turned away due to their marital status and no prospective tenant had every complained about landlords).

Because it cannot point to any actual discrete enforcement risk to one of its members, CEA instead relies on the claim that EEOC has interpreted Title VII "to require employers . . . that provide health plans or employee health insurance coverage to pay for and provide gender transition services within those benefits" or to "risk facing serious and harsh penalties."  Compl. ¶¶ 65-66.  CEA deems this the "EEOC Coverage Mandate."  *Id.*  But EEOC's enforcement materials reflect that it has not taken any position on whether an objecting religious entity's refusal to provide gender-transition services under a health plan constitutes unlawful discrimination.  For example, EEOC's Compliance Manual on Religious Discrimination, Directive 915.063, § 12 (Jan. 15, 2021) suggests that this remains an open question, stating that the "applicability and scope of . . . defenses based on Title VII's interaction with the First Amendment or . . . RFRA[] is an evolving area of the law."  *Id.* at § 12-1-C.  The EEOC Compliance Manual also counsels EEOC investigators to "take great care" in situations involving RFRA, directs EEOC personnel to "seek the advice of the EEOC Legal Counsel in such a situation," and notes that "on occasion, the [EEOC] Legal Counsel may consult as needed with the U.S. Department of Justice."  *Id.*

---

[5] In fact, the probability of such contingencies actually occurring to a CEA member is remote.  In the last eight years, EEOC has found reasonable cause for approximately 3% of the LGBT-based sex discrimination charges it has received.  *See* EEOC, *Title VII of the Civil Rights Act of 1964 Charges*, https://go.usa.gov/x6bED.  Relatedly, in the last nine years, EEOC has filed only between 46 and 117 Title VII enforcement actions, of any sort, per year.  *See* EEOC, *EEOC Litigation Statistics, FY 1997 through FY 2020*, https://go.usa.gov/x6bmB.

The recently issued EEOC Document confirms the point.  That document reiterated the agency's "established legal position[]" that gender-identity discrimination is prohibited by Title VII, a conclusion that the Supreme Court confirmed in *Bostock*.  But the mere fact that EEOC interprets Title VII to proscribe gender-identity discrimination as a general matter does not mean that EEOC will conclude that every particular set of facts—including the denial of coverage for gender-transition services—constitutes gender-identity discrimination.  *See Trump*, 141 S. Ct. at 534.  In *Trump*, the Supreme Court considered plaintiffs' constitutional challenge to a Presidential Memorandum concerning the census that declared a policy of excluding "'from the apportionment base [noncitizens] who are not in a lawful immigration status.'"  *Id.* (citation omitted).  The Court found that the plaintiffs' theory of standing was "riddled with contingencies and speculation that impede[d] judicial review."  *Id.* at 535.  Although the President had stated his policy in plain terms, it was not then clear how the policy would be put into practice, "let alone" whether it would be put into practice "in a manner substantially likely to harm any of the plaintiffs here."  *Id.* at 535.  As the Court explained, "the Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction."  *Id.* at 536.

The same analysis applies with equal force here.  EEOC understands Title VII to proscribe gender-identity discrimination, but any future agency action will reflect the legal and practice constraints of enforcing such a prohibition, particularly where a religious defense is raised.  While CEA alleges that EEOC does not permit religious exemptions to its so-called coverage mandate (Compl. ¶ 8), the EEOC Document makes clear that the "ministerial exception . . . bars certain employment discrimination claims by the employees of religious institutions," and, further, that other "defenses might also be available to employers depending on the facts of a particular case."  EEOC Document at 5; *see also* EEOC Compliance Manual.[6]

CEA contends that EEOC *has* set out such a definitive enforcement position by pointing to a

_____

[6] Indeed, EEOC sometimes does dismiss charges where employers raise religious defenses.  *See, e.g., Newsome v. EEOC*, 301 F.3d 227, 229-230 (5th Cir. 2002) (per curiam).

single enforcement action—*EEOC v. Deluxe Financial Services, Inc.*, No. 0:15-cv-2646 (D. Minn.).  *See* Compl. ¶ 73.  But in that case, EEOC did *not* assert any claims concerning the scope of gender-transition services covered by the employer's insurance plan.  *See EEOC v. Deluxe Financial Services, Inc.*, No. 0:15-cv-2646 (D. Minn.), ECF No. 1 (EEOC complaint). Instead, the *employee* in question intervened and asserted such claims. *See id.*, ECF No. 26 (intervenor complaint).  The district court subsequently entered a consent decree signed by all parties providing relief on the insurance-coverage claim.  *See id.*, ECF No. 37 at 11 (consent decree).  But at no point in the proceedings did EEOC itself adopt the private employee's legal theories as its own, and CEA may not impute the private litigant's challenge to EEOC.  *See Balogh v. Lombardi*, 816 F.3d 536, 544 (8th Cir. 2016) (plaintiff did not have standing despite the threat of private lawsuits because the "injury is 'fairly traceable' only to the private civil litigants"); *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("Private litigants with rights to enforce the Act would not be the subject of any relief in this action, and any judgment would not oblige private litigants to refrain from proceeding under the act.").  CEA is simply wrong in alleging that EEOC "specifically enforced" Title VII to require such insurance coverage. Compl. ¶ 73.  Further still, the employer in that case was *not* a religious employer, nor did it raise any RFRA or First Amendment defense in the district court proceedings.

CEA also points to an amicus brief that EEOC filed in *Robinson v. Dignity Health*, No. 16-cv-3035, 2016 WL 3153023 (N.D. Cal.) ("*Robinson*").  *See* Compl. ¶¶ 74-76.  But as with *Deluxe Financial Services*, the claimant there was a private employee pursing a Title VII claim, not EEOC.  In fact, EEOC *declined* to pursue its own enforcement action in that case.  *Robinson*, ECF No. 1-2 at 5. Moreover, Dignity Health also did *not* raise any religion-based defenses to the private employee's claim. *See Robinson*, ECF Nos. 49-1, 50.  Further still, while CEA claims that Dignity Health is "a large health care system that includes many Catholic hospitals," Compl. ¶ 74, the actual employer-hospital at issue in that case describes itself as "non-Catholic."  *See* Chandler Regional Medical Center, *About Us*, https://perma.cc/WP9L-AFDY.  EEOC filed an amicus brief in support of the employee agreeing that he had stated a plausible Title VII claim against his non-religious employer asserting no religious defense; but that case-specific conclusion, filed as a non-party *amicus*, hardly rises to the status of a

"mandate," particularly as to *religious* employers. The fact that CEA cannot point to an enforcement action brought by EEOC on such grounds—never mind one against a religious employer or employer asserting religious defenses—proves the point.

CEA relies heavily on the fact that the *RSM* court concluded the CBA plaintiffs in that case had standing to challenge EEOC's Title VII enforcement. But that conclusion relied upon the mistaken understanding that under the 2016 Rule, "HHS confirmed that the EEOC would pursue enforcement actions against nonhealthcare employers with gender-transition exclusions in their health plans." *RSM*, 513 F. Supp. 3d at 1141. As an initial matter, CEA's claims here appear to sweep far more broadly—it alleges that EEOC has independently established its own coverage "mandate" under Title VII, and not only that it will accept referrals from HHS under the 2016 Rule. *Compare RSM*, Case No. 3:16-cv-386, ECF No. 97 ¶¶ 154-161 (alleging the 2016 Rule "announces that the EEOC will enforce a similar rule" to HHS) *with* Compl. ¶ 64 (alleging EEOC's position has been "consistent . . . for almost 10 years").

The *RSM* court also misread the relevant portion of the 2016 Rule, which stated only that when HHS "lack[ed] jurisdiction over an employer responsible for" an allegedly discriminatory health-insurance plan, HHS "typically will refer or transfer the matter to EEOC and allow that agency to address the matter." 81 Fed. Reg. at 31,432. The mere fact that HHS, under a now rescinded rule, would refer cases to EEOC did not "confirm" or "announce" that EEOC itself would ultimately pursue enforcement actions against employers with gender-transition exclusions in their health plans, never mind against religious employers. That is particularly true given that HHS itself, and not EEOC, promulgated the 2016 Rule.[7]

---

[7] The *RSM* court further erred in concluding that plaintiffs had sufficiently established an imminent risk of enforcement. The two cases it relied upon to that end—*United Food & Commercial Workers International Union v. IBP, Inc.*, 857 F.2d 422 (8th Cir. 1988), and *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019)—involved circumstances where the defendants had previously brought enforcement actions against the plaintiffs. *See* 857 F.2d at 427 (explaining that past prosecution is "relevant to determining the existence of a present threatened injury"); 942 F.3d at 455 (explaining that plaintiffs' fear of prosecution was not unreasonable because "they have already been arrested or cited under a prior version of the law"). CEA cannot make a similar claim here. In both cases the statutes at issue also unambiguously proscribed the conduct at issue. *See* 857 F.2d at 430 (noting that the plaintiffs "desire to engage in conduct violative of" the law); 942 F.3d at 455 (noting that "the law's plain language

Finally, CEA's challenge to EEOC poses significant traceability issues. CEA does not place the EEOC "mandate" in any legislative rule or regulation—indeed, EEOC *cannot* promulgate such rules or regulations. *See Gen. Electric Co. v. Gilbert*, 429 U.S. 125 (1976). CEA instead challenges EEOC's purported interpretation of Title VII itself, as well as various interpretive rules and policy statements EEOC has published, but which lack any independent legal force. *See AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) (explaining EEOC inflicted no harm on plaintiff "merely by expressing its view of the law—a view that has force only to the extent the agency can persuade a court to the same conclusion"). Its request that the Court "set aside . . . EEOC's agency guidance and the resulting EEOC Coverage Mandate," Compl., Prayer for Relief § D, illustrates the point. Such "agency guidance" by definition lacks the force of law, and setting it aside would grant no meaningful relief to CEA. Plaintiff therefore cannot trace any present or future harm to this agency interpretive guidance. *See Von Aulock v. Smith*, 720 F.2d 176, 181 (D.C. Cir. 1983) (finding plaintiffs lacked standing in challenge to interpretive bulletin, even in the absence of the guidance, the agency could still apply the same interpretation).

### 2. *Plaintiff's claims against EEOC are not ripe.*

CEA's claims against EEOC are not ripe for similar reasons. "'Ripeness requir[es] [the court] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *United States v. Gates*, 915 F.3d 561, 563 (8th Cir. 2019) (quoting *Texas*, 523 U.S. at 300-01). "The fitness prong safeguards against judicial review of hypothetical or speculative disagreements." *Id.* (citation omitted). "The hardship prong considers whether delayed review inflicts significant practical harm on the petitioner." *Id.* (citation omitted).

CEA's challenge is not fit for judicial review because, at this stage, the Court would be reviewing a purely hypothetical disagreement without the benefit of any concrete set of facts. *See*

---

covers [the plaintiffs'] intended activities"). But while Title VII proscribes gender-identity discrimination generally, the convergence of Title VII and RFRA—the relevant statutes in this case— in this context leaves uncertainty regarding the scope of proscribed conduct, as the Supreme Court itself recognized. *See Bostock*, 140 S. Ct. at 1754 (reserving the question of how RFRA and other "doctrines protecting religious liberty interact with Title VII" and explaining that these "are questions for future cases").

*Gates*, 915 F.3d at 563 ("The fitness prong safeguards against judicial review of hypothetical or speculative disagreements."). While CEA speculates about how EEOC may enforce Title VII in the future, any *actual* dispute over enforcement would require resolving numerous predicate factual questions concerning, among others, the employer's allegedly discriminatory actions; the nature of the employer's religious beliefs; and the extent of any burden placed upon them by EEOC's enforcement. This factual development is required not only because EEOC must adduce actual evidence of discrimination by the employer, but also because RFRA itself "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-431, (2006) (further explaining RFRA concerns granting exemptions "to particular religious claimants"). And RFRA similarly requires courts themselves to "strike sensible balances, pursuant to a compelling interest test that requires the Government to address *the particular practice at issue.*" *Id.* at 439 (emphasis added). But because EEOC has not yet enforced Title VII in the manner CEA describes, there is no substantial burden upon a "particular claimant" or "person," or a "particular practice at issue," to evaluate against a concrete claim of discrimination involving an actual applicant or employee. Simply put, CEA seeks an advisory opinion from the Court about whether a hypothetical future enforcement action against one of its members would be lawful, which is not a permissible basis for a challenge. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 736 (1998) (concluding that dispute was not justiciable where review "would require time-consuming judicial consideration" "without benefit of the focus that a particular [application of the challenged agency plan] could provide"); *accord Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982) (per curiam) ("We do not sit to . . . give advisory opinions about issues as to which there are not adverse parties before us.").

The Supreme Court has denied challenges as unripe where the theory of the case preceded any certainty regarding how the challenged laws might actually be applied, even where the challenge turned primarily on legal issues. For example, in *National Park Hospitality Association v. Department of Interior*, 538 U.S. 803 (2003), the "purely legal" question at issue centered on whether the Contract

Disputes Act of 1978 was applicable to concessions contracts. But the Court still held that the need for factual development made the dispute unripe because there might be some subset of contracts for which the answer would be different, and because even the facial challenge in that case relied on factual questions about different types of contracts. *Id.* at 812. The same is true here—even if it is a purely legal question whether Title VII prohibits to the failure to cover gender-transition services, there remain substantial questions regarding when and how that prohibition would be enforced, as the Supreme Court has recognized. *Cf. Bostock.*, 140 S. Ct. at 1753. Courts have long recognized that even a "purely legal" question is unfit for adjudication where a concrete factual context would facilitate a court's "ability to deal with the legal issues presented." *National Park Hosp. Ass'n*, 538 U.S. at 812 (quotation marks omitted); *see, e.g.*, *Texas*, 523 U.S. at 301; *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 56 (1974); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163 (1967); *Zemel v. Rusk*, 381 U.S. 1, 18-20 (1965); *Communist Party of the U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 78 (1961); *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 89-90 (1947).

Ultimately, the operation of EEOC's enforcement policies will be "better grasped when viewed in light of a particular application" because "[d]etermination of the scope of . . . legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Texas*, 523 U.S. at 301 (quoting *Longshoremen v. Boyd*, 347 U.S. 222, 224 (1954)) (cleaned up). The judicial function is properly limited to such concrete cases or controversies, and should not be expanded to permit private plaintiffs to preemptively block agencies from adopting positions based purely on the plaintiff's abstract disagreement with such positions. *See Ohio Forestry Ass'n*, 523 U.S. at 733 (considering whether "judicial intervention would inappropriately interfere with further administrative action" in finding case not justiciable); *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 796 (8th Cir. 2016) (ripeness protects "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties").[8]

---

[8] The *RSM* court concluded that the CBA's claims against EEOC were ripe because "no additional factual development" was needed. 513 F. Supp. 3d at 1145. But before a court could rule in EEOC's

Finally, because CEA has not alleged any plausible, imminent threat of enforcement by EEOC against its members, no hardship will be imposed on CEA or its members by waiting until there is a concrete dispute for the Court to review.  The Eighth Circuit "has repeatedly stated that a case is not ripe if the plaintiff makes no showing that the injury is direct, immediate, or certain to occur."  *See Public Water Supply Dist. No. 10 of Cass Cty. v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003). Forestalling review poses no prejudice to any CEA member who may be involved in such a hypothetical future dispute because the employer-member would be perfectly free at that time to raise the same statutory and constitutional arguments that CEA raises here—assuming an EEOC administrative charge is ever even filed against them to begin with.  *See id.* (holding that case was not ripe where plaintiff faced "no hardship as a result of this court withholding review because it can raise its" claim challenging the city's dissolution of a district "when and if a petition [for dissolution] is filed").  Indeed, another court within this district has already found that forestalling unripe challenges to EEOC enforcement procedures poses no hardship because "[i]f and when the EEOC or the charging party files suit in district court . . . the plaintiff will have the opportunity to refute the charges." *See Standing Rock Hous. Auth. v. EEOC*, 585 F. Supp. 2d 1112, 1120 (D.N.D. 2008) (Hovland, J.) (quoting *Georator Corp. v. EEOC*, 592 F.2d 765, 768 (4th Cir. 1979).  CEA offers no explanation as to why each claim asserted here could not similarly be raised for *de novo* review in any future enforcement proceeding, if one were ever to take place.

CEA also does not plausibly allege that any of its members currently face any hardship attributable to the EEOC.  Indeed, many of its members "already categorically exclude coverage for gender transition services," Compl. ¶ 54, belying any claim that EEOC's policies discourage them from doing so.  Further, to the extent other members "desire to categorically exclude such coverage for gender transition services," *id.*, CEA nowhere alleges that their desire is thwarted by EEOC.  Even

---

favor in an enforcement action, it would necessarily need to evaluate a factual record regarding the employer's conduct, what EEOC asked the employer to do differently, what burden that request places on the plaintiff's religious exercise, and whether EEOC could comply with RFRA's strict scrutiny standard.  Moreover, as the Supreme Court explained in *National Park Hospitality Association*, cases presenting purely legal questions are *still* unripe if further factual development would aid resolution of the case.

if one of these unidentified members was theoretically hesitant to adopt such exclusionary health coverage, "mere uncertainty" about the law does not "constitute[] a hardship for purposes of the ripeness analysis." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811.

> **B.**  **CEA has failed to demonstrate standing and ripeness for its challenge to HHS's future enforcement of § 1557.**

>> 1.  *Plaintiff lacks standing to challenge HHS's interpretation of § 1557.*

The Supreme Court explained in *Bostock* that it is "impossible to discriminate against a person" on the basis of sexual orientation or gender identity "without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741.  In May 2021, HHS issued its Notification stating that, going forward, it would also read § 1557's prohibition on sex discrimination, through its incorporation of Title IX, "to include: (1) Discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." 86 Fed. Reg. at 27,984.  But the Notification goes no further than the reasoning of *Bostock* itself, explaining that the Notification's interpretation "will guide" HHS "in processing complaints and conducting investigations, but does not itself determine the outcome in any particular case or set of facts." *Id.* And it further stressed that HHS, in any future enforcement actions, would "comply with [RFRA]" and all applicable court orders. *Id.* Nothing in the Notification, or any other HHS rule or guidance, evaluates whether § 1557 requires provision and coverage of gender-transition procedures by entities with religious objections to providing or covering such procedures, or how RFRA and other religious exemptions might apply to such entities.

CEA nonetheless alleges that HHS requires its unidentified healthcare members to perform a wide array of services, including prescribing drugs and performing various surgical procedures on people seeking gender-transition services.  *See* Compl. ¶ 123(a)-(w).  Setting aside that CEA does not even allege that any of its anonymous healthcare members have ever been asked to perform these procedures by someone seeking gender-transition services, in neither the 2020 Rule nor the Notification has HHS taken the view that refusal to provide these services constitutes gender-identity discrimination.  To the contrary, the Notification expressly states that its interpretation of § 1557 does *not* "determine the outcome in any particular case or set of facts." 86 Fed. Reg. at 27,985.  CEA's

claim to the contrary, made without pointing to a single instance of the agency taking such a view, is pure speculation.

The Supreme Court's recent decision in *Trump v. New York* is again instructive. The President there issued a "general statement of policy" regarding the Census but did not explain how it would be specifically implemented. The Court concluded standing was lacking because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time." *Trump*, 141 S. Ct. at 535 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). CEA's predictions here about how HHS may someday enforce the Notification—which does not say a word about *any* of the procedures or prescriptions identified in the complaint—offers similarly insufficient conjecture. *Id.* (explaining the "policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here").

CEA's claimed harm is all the more conjectural because the Notification explicitly states that HHS "will comply with the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, and all other legal requirements." 86 Fed. Reg. at 27,985. CEA acknowledges the Notification's stated intent to comply with RFRA, *see* Compl. ¶ 117, but complains that it "did not detail how HHS would comply with RFRA," *id.* ¶ 118. But that gets it backwards—RFRA calls for an individualized determination into how agency action burdens a particular person's religious practice, and whether that burden is justified by a compelling interest and narrowly-tailored policy. *See O Centro*, 546 U.S. at 430-431, 439. HHS, of course, cannot predict in advance how RFRA will apply to any particular future enforcement action or set of facts—precisely why the Notification says any application will be on a case-by-case basis. *See* 86 Fed. Reg. at 27,985. That highlights the flaw with CEA's theory of harm—its complaint simply assumes that HHS will not properly apply RFRA in some future proceeding if it also chooses to enforce § 1557 in a particular manner. But standing cannot rest on such "contingencies and speculation" about the contours of future enforcement that may well never come. *Trump*, 141 S. Ct. at 535 (explaining such theories of standing "impede judicial review"); *see also Iowa Right To Life Comm., Inc. v. Tooker*, 717 F.3d 576, 586 (8th Cir. 2013) (finding lack of standing where state "ha[d] not threatened" enforcement action against plaintiff, "let alone threatened" to do so without applying

proper legal standards).

Plaintiff's remaining argument is that the preliminary injunctions entered against the 2020 Rule, in effect, "reinstated the 2016 Rule's definition" of discrimination on the basis of sex incorporating gender-identity discrimination, and "eliminated the religious exemption protection from Title IX." PI Mot. at 9; *see also* Compl. ¶ 120.  As an initial matter, that is not correct, as both courts that entered preliminary injunctions against portions of the 2020 Rule acknowledged that they had "no power to revive [provisions] vacated by another district court." *Walker*, 480 F. Supp. 3d at 427; *Whitman-Walker Clinic, Inc.*, 485 F.Supp.3d at 26 (explaining that the court was "powerless to revive" provisions that the *Franciscan Alliance* district court had vacated).   Accordingly, the preliminary injunctions against the 2020 Rule did not affect the *Franciscan Alliance* district court's vacatur of the 2016 Rule "insofar as [it] define[d] 'on the basis of sex' to include gender identity." Order at 2, *Franciscan All.*, 414 F. Supp. 3d 928 (No. 16-cv-00108), ECF No. 182 (quotation marks omitted). Further, even if these injunctions *had* reinstated a definition of sex discrimination incorporating gender-identity discrimination, that would not place CEA member's at imminent risk of enforcement. The Notification confirms the point, explaining that any future gender-identity discrimination enforcement will be case-specific and account for RFRA.  *See* 86 Fed. Reg. 27,985.

The *RSM* court concluded that the plaintiffs there had standing to challenge HHS's interpretation of § 1557, but it relied upon the same flawed argument regarding the effect of the *Whitman-Walker* and *Walker* injunctions.  *See* 513 F. Supp. 3d at 1138.[9]  The *RSM* court's conclusion on standing was also, itself, speculative.  For example, it concluded that "Section 1557 *arguably* proscribes Plaintiffs' refusal to perform or cover gender-transition procedures." 513 F. Supp. 3d at 1138 (citation omitted and emphasis added).  But  it is not enough that § 1557 "arguably" proscribes actions that CEA members purportedly wish to take—the asserted proscription must be "actual or imminent" to supply standing.  *SBA List*, 573 U.S. at 158.  That requires CEA, as well as the plaintiffs

---

[9] Further, that court did not have the benefit of considering the Notification, which made clear that HHS has not staked out a definitive enforcement position on such conduct and would expressly account for RFRA in any enforcement proceeding.  *See* 86 Fed. Reg. at 27,985.

in *RSM*, to establish that the "threat of future enforcement . . . is substantial," for example by showing "a history of past enforcement" or where the agency made a prior determination of "probable cause" that a specific person or entity violated the statute. *Id.* at 164. But no such showing has been made here. *See Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014) (explaining that "'mere speculation' that injury did or might occur 'cannot satisfy'" Article III's requirement that an injury be "'concrete, *particularized*, and *actual* or imminent'" (emphasis in original) (citation omitted)).

Similarly, the court found that because the 2020 Rule did not adopt a regulatory definition of sex, and instead merely adopted the statutory text, it "l[eft] the door open to" possible future applications of *Bostock*. 513 F. Supp. 3d at 1138. But the fact that *Bostock* 'left open the door' to particular applications of a statute does not place CEA or its members at imminent risk of such applications, particularly where HHS has made clear that any future applications will comply with RFRA. *See* 86 Fed. Reg. at 7,024 (directing agencies to "consider whether to" take any actions "necessary to fully implement statutes that prohibit sex discrimination" and "consistent with applicable law" (which includes RFRA)); 86 Fed. Reg. at 27,985 (explicitly stating that HHS "will comply with the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, and all other legal requirements" when enforcing Section 1557). *Bostock* itself expressly noted that these were questions for future, *concrete* cases. *See* 140 S. Ct. at 1754 (explaining RFRA "operates as a kind of super statute" that "might supersede Title VII's commands in appropriate cases" but that the contours of such doctrine are "for future cases").

Finally, the *RSM* court concluded the plaintiffs faced a credible threat of enforcement, reasoning that "[s]uch a threat arises when a course of action is within the plain text of a statute." 513 F. Supp. 3d at 1139 (citation omitted). But the convergence of § 1557 and RFRA—the relevant statutes in this case—in this context leaves uncertainty regarding the scope of proscribed conduct. The *RSM* court reached that conclusion by considering § 1557 and Title IX in isolation. But as *Bostock* explained, RFRA may "supersede" the application of other statutes in certain cases. 140 S. Ct. at 1754. The *RSM* court thus erred in failing to consider the interaction of RFRA with § 1557.

2. *Plaintiff's claims against HHS are not ripe.*

Plaintiff's claims against HHS are also unripe for substantially the same reasons.  As with its claims against EEOC, the RFRA and First Amendment claims CEA brings against HHS ultimately turn on case-specific assessments and are thus are not yet fit for judicial review.  Any dispute will turn on non-legal questions about *how* HHS chooses to enforce § 1557 in the future and the facts of a specific enforcement proceeding.  For example, HHS could interpret § 1557 to require provision of some gender-transition services or none at all.  And it could further require that some services be provided only under particular circumstances, or only by particular kinds of providers.  Until there is a fully developed factual record in which HHS is actually requiring one of Plaintiff's members to do something specific, the Court cannot evaluate whether a particular member's religion is substantially burdened, and whether HHS puts forth a sufficiently compelling interest, using the least restrictive means, in regulating that member's conduct.  *See Cuffley*, 112 F.3d at 1337.  Indeed, HHS could take the view that religious entities do not need to provide certain services *at all*, mooting any dispute altogether.  *See Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 694 (8th Cir. 2003) (holding that case was not ripe because "[w]ithout additional factual development, we cannot be sure there is even a dispute here to resolve.").  HHS has not set forth the circumstances, if any, where § 1557 may require provision of gender-transition services, or when religious defenses might overcome such requirements.  For that reason, CEA's claims are best adjudicated in the context of a developed factual record in which HHS is actually requiring a CEA member to do something specific, at which point that member will be able to assert the same claims here.  *See Renne v. Geary*, 501 U.S. 312, 324 (1991) (explaining that "[r]ules of justiciability" counsel against deciding a case "based upon the amorphous and ill-defined factual record presented to us").

The *RSM* court found a RFRA claim ripe for review because it found that plaintiffs "must either alter their policies for providing and covering gender-transition procedures (which the Catholic Plaintiffs assert will violate their religious beliefs and North Dakota its sovereign interests) or risk the loss of critical federal healthcare funding along with potential civil and criminal penalties."  513 F. Supp. 3d at 1145.  But that analysis ignores the governing regulatory framework and incorrectly

presumes that a sudden suspension of federal funding is possible.  Plaintiffs do not face a risk of sudden loss of healthcare funding but a risk that they will one day be subject to a notice of a failure to comply and an informal procedure whereby HHS will determine whether voluntarily compliance is possible—followed by an administrative hearing and notice to congressional committees—all before the possibility of suspension of federal funding.  20 U.S.C. § 1682; *Colwell v. HHS*, 558 F.3d 1112, 1128-1129 (9th Cir. 2009); *cf. Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829 (D.C. Cir. 2006) (finding lack of standing where noncompliance would not "trigger an immediate funding cut-off" due to intervening administrative process).

Because CEA and its members have not suffered any injury and face no prospect of imminent enforcement, withholding review here imposes no hardship upon them.  *Cf. 281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) (claim was ripe where plaintiffs' alleged injury was "not based on speculation about a particular future prosecution").  Withholding review now does not prejudice a CEA member's ability to assert identical claims—with the benefit of a concrete factual backdrop—in an actual enforcement action later, assuming such enforcement ever occurs.  *Ohio Forestry Ass'n*, 523 U.S. at 729-30, 733-734 (holding that case was not ripe where plaintiff "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain," and noting that there would be an administrative process before plaintiffs would face any "practical harm").

### C.    CEA has failed to establish associational standing on behalf of its unidentified members.

CEA seeks relief "[o]n behalf of its members," rather than on its own behalf.  Compl. ¶ 13; *see also id.* ¶¶ 14-15; Prayer for Relief.  To establish such "representational" or "associational" standing, it must show that (1) its members would have standing to sue in their own right, (2) the interests it seeks to vindicate are germane to the organization's purpose, and (3) the participation of individual members is not required.  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 809 (8th Cir. 2007) (same).  But in neither its complaint nor preliminary injunction motion does CEA ever explain how it has standing to seek relief on behalf of these anonymous members.

CEA already cannot establish the first requirement, standing, on behalf of any individual member for the reasons above.  But its failure to identify a *single* member potentially harmed by the so-called mandates, or to supply any affidavit from its members illustrating alleged harms, further frustrates the Court's obligation to ensure that it possesses Article III jurisdiction.  Because "the court has an independent obligation to assure [itself] that standing exists," it may not simply "accept[] the organizations' self-description[] of [its] membership."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  Without identifying any members or supplying any affidavits, for example, "how is the court to assure itself" that plaintiffs are actually "affected by the challenged activity" or will be "burdened by the . . . challenged procedures?"  *Id.*  That is why "the [Supreme] Court has required plaintiffs claiming organizational standing to identify members who have suffered the requisite harm."  *Id.*; *see also Ouachita Watch League v. United States Forest Serv.*, 858 F.3d 539, 543 (8th Cir. 2017) (finding no live case or controversy where plaintiff failed to identify members).[10]

CEA also fails to meet the third requirement for associational standing because "the claim[s] asserted [and] the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.  RFRA claims, along with CEA's closely-related First Amendment claims, turn on a plaintiff's ability to show that the plaintiff's exercise of a sincerely held religious belief is substantially burdened, and on the government's ability to show a compelling interest served by the least restrictive means.  *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014).  The nature of a specific employer's asserted religious beliefs, and the extent to which they are burdened by any putative agency enforcement, are particularized determinations that will vary based on the discriminatory conduct alleged, the scope of what an enforcing agency believes the law requires, the impact of that requirement on the religious objector, and the nature of the objector's religious beliefs.  For that reason, claims based on religious belief "ordinarily require[] individual participation" because "it is necessary" in such a case "for one to show the coercive effect of the enactment as it operates

---

[10] Organizational plaintiffs may, in limited cases, proceed without identifying their members.  *See, e.g., NAACP v. Alabama*, 357 U.S. 449 (1958).  But CEA makes no effort to show that such an exception applies here.

against him in the practice of his religion." *See Harris v. McRae*, 448 U.S. 297, 321 (1980) (finding organization lacked standing to challenge Hyde Amendment); *see also Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1963) (explaining that the purpose of the Free Exercise Clause is "to secure religious liberty *in the individual*" and "[h]ence it is necessary . . . for one to show the coercive effect of the enactment *as it operates against him*" in the practice of his religion" (emphases added)).

The need for individual member participation is heightened by CEA's choice to pursue preliminary injunctive relief, a category of "requested relief" that almost by definition "require[]s the participation of individual members." *Hunt*, 432 U.S. at 343.  Preliminary relief requires CEA to establish, among other things, irreparable harm.  *See Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008).  But the degree to which any one CEA member faces imminent irreparable harm is a fact-specific and necessarily individualistic inquiry.  CEA assures the Court that it has "numerous members," Compl. ¶ 48, that "[m]ost of CEA's members employ more than 15 employees," *id.* ¶ 51, and that, with "possible exception[s]," *id.* at ¶ 47, most of these employers offer health insurance.  But, for example, do any of these CEA members actually employ a transgender person or have a patient seeking gender-transition services?  Does that member offer health insurance or provide services comparable to the requested gender-transition service?  Has an employee asked that such insurance cover gender-transition services?  Has the same employee or patient threatened to file a complaint with EEOC or HHS?  CEA elides these questions altogether by failing to name *any* members who claim to be harmed.  But that is not appropriate where, as here, the answers to these questions speak to the scope of relief, the appropriateness of a preliminary injunction, and whether an Article III controversy exists at all.

CEA goes further still by seeking preliminary relief on behalf of *future* members, Compl. ¶ 15; PI Mem. at 46, but it is not possible for the Court to determine whether these hypothetical future members—which, by definition, are not presently identifiable and may not exist—are entitled to preliminary relief *now* because of the prospect of *imminent* and *irreparable* harm.  Indeed, CEA fails to explain how its requested injunctive relief for *any* of its members complies with Rule 65's requirement that such relief "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(a).  EEOC and HHS have no way of knowing who CEA's members are, and by extending

injunctive relief to *future* members, non-parties to this action could potentially avoid enforcement by seeking to join CEA after-the-fact, rather than putting forth their own good faith RFRA claims.

CEA tries to overcome this deficiency by alleging that it has membership requirements that ensure its members all hold religious beliefs that are necessarily burdened here. *See* Compl. ¶¶ 43-55. But CEA's self-described membership standards do not relieve the Court from examining the actual burden of the so-called "mandates" on any individual CEA member's religious exercise, *Harris*, 448 U.S. at 321, or from finding that every individual member to whom a potential preliminary injunction runs *actually* faces the prospect of irreparable harm, *Winter*, 555 U.S. at 22.

Indeed, CEA's effort to proceed on behalf of anonymous future members raises the prospect that it is seeking to, in effect, circumvent ordinary requirements for obtaining class-action relief, creating a boundless class of religious employers and providers that benefit from a judgment in CEA's favor, but without any corresponding inquiry into whether they in fact possess standing, face irreparable harm, or have meritorious claims. This further raises *res judicata* concerns because a "future" CEA member, or an unidentified present member, will have the option of claiming the benefit of any judgment running to CEA, but can also choose to avoid the preclusive effect of a negative, or less than fully favorable, judgment.

The lack of any individual member's involvement, or any affidavits from individual members, reinforces more broadly why Article III standing is lacking here—CEA's challenge is at bottom an abstract disagreement between the organization's own purported beliefs and what it guesses EEOC or HHS may do in the future. But federal courts do not serve as debating societies to hash out such academic disputes. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

## II.     CEA's Claims Are Unlikely To Succeed On Their Own Merits

### A.     EEOC and HHS do not substantially burden any person's religious practice.

RFRA provides that the "Government shall not substantially burden a person's exercise of religion" unless it can show that it "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. §§

2000bb-1(a)-(b).  Accordingly, the first requirement under RFRA is that "a religious objector must show that the government substantially burdens a sincere religious exercise or belief."  *Sharpe Holdings, Inc. v. Health & Human Servs.*, 801 F.3d 927, 937 (8th Cir. 2015), *vacated on other grounds by Dep't of Health & Human Servs. v. CNS Int'l Ministries*, No. 15-775 (2016).  Only after a religious objector makes that predicate showing does the Government bear the burden of showing that its policy furthers a compelling interest and is appropriately tailored.  *Id.*; *see also Pratt v. Corr. Corp. of Am.*, 267 F. App'x 482, 482-483 (8th Cir. 2008) (affirming grant of summary judgment to defendants where individual "did not show that defendants placed a 'substantial burden' on his ability to practice his religion").

For all the reasons above, CEA has failed to plausibly make the predicate showing that EEOC or HHS substantially burdens any individual's sincerely-held religious belief or practice.  CEA does not point to a single "person" or "religious objector" whose religious exercise has been burdened, nor does CEA assert that its *own* such religious exercise has somehow been substantially burdened.  CEA instead relies on its unadorned claim that all of its anonymous members adhere to common religious beliefs, but that approach elides RFRA's focus on "the application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *O Centro,* 546 U.S. at 430-431; *see also Olsen v. Mukasey*, 541 F.3d 827, 831 (8th Cir. 2008).  Further, CEA fails to allege that any of its members have been subject to enforcement under either of HHS's or EEOC's so-called "mandates," or face imminent risk of such enforcement.  And, as explained, neither EEOC nor HHS have yet taken a position regarding how RFRA applies in the context of a request that an employer cover, or a healthcare provider perform, gender-transition services.  Because Plaintiff has failed to show any substantial burden on a person's religious exercise, its RFRA claims necessarily fail.

CEA contends that its numerous, unidentified members are, in fact, substantially burdened because at present they must choose between (1) compliance with rules that compel them to perform, or to provide healthcare coverage for, gender-transition services, thus violating their religious beliefs; or (2) non-compliance that risks incurring penalties and loss of funding.  *See* PI Mem. at 17-18.  But this is a false choice for at least two reasons.  *First*, neither EEOC nor HHS has in fact taken the

position that a religious entity's failure to perform, or provide coverage for, such gender-transition services always constitutes gender-identity discrimination. And *second*, both EEOC and HHS have stated that any future gender-identity discrimination enforcement decision will account for RFRA and other applicable statutes. CEA acknowledges, for example, that the HHS Notification "stated that HHS would comply with RFRA," Compl. ¶ 117, but then alleges that the Notice "did not detail how HHS would comply with RFRA." *Id.* ¶ 118. As explained above, agencies cannot predict ahead of time how RFRA will apply to the facts of a particular matter. HHS's enforcement rules, for example, contemplate individualized investigations into discrimination claims. *See* 45 C.F.R. §§ 80.6-80.8.[11] Whether RFRA provides a viable defense to an enforcement action in an individual case is a necessarily individualized determination that cannot be made *ex ante*. *See O Centro*, 546 U.S. at 430-431. CEA's claim that HHS has not detailed how it will comply with RFRA simply reinforces why its claims are not ripe—the need to assess RFRA's applicability to a particular CEA member's conduct may (or may not) arise in the future, but it is not a judicially ripe question today.

**B.      Plaintiff cannot prevail on its First Amendment claims.**

CEA also asserts Free Exercise Clause claims against both EEOC and HHS that are duplicative of its RFRA claims, as well as a Free Speech claim against HHS specifically. These claims are not likely to succeed for the reasons above, namely that CEA has not in fact identified a true burden on its members' constitutional rights because the mandates it challenges do not exist. But its arguments here fail for additional reasons as well.

As to the Free Exercise claims, laws that are "neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). The laws at issue here—§ 1557 (through Title IX) and Title VII—generally proscribe discrimination "on the basis of" or "because of" sex by certain employers and healthcare providers.

---

[11] EEOC's enforcement process is also focused on discrete claims of discrimination. *See* 42 U.S.C. § 2000e-5. And, like the Notification, the EEOC Document states the agency will "consider and apply, on a case by case basis, any religious defenses to discrimination claims." EEOC Document at 5.

**Defendants' Opp. to PI Motion – Page 34**

*See* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 18116(a) (citing 20 U.S.C. § 1681); *see also EEOC v. Roman Cath. Diocese of Raleigh*, 48 F. Supp. 2d 505, 512 (E.D.N.C. 1999) ("The court agrees with plaintiff that Title VII is a neutral law of general applicability."), *aff'd,* 213 F.3d 795 (4th Cir. 2000)).

CEA contends these laws are not generally applicable because they do not apply universally to all employers or healthcare providers. *See* PI Mem. at 26-30. But that argument misunderstands what it means for a law to be "generally applicable." A law may "lack[] general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (cleaned up). Thus, a city could not constitutionally prohibit a particular kind of conduct—animal sacrifice that formed the practice of a religious faith—while not prohibiting similar secular activity undermining the government's interest in a similar manner, such as refusing to regulate improper garbage disposal. *See id.* (citing *Church of the Lukumi Babalu Aye*, 508 U.S. at 542-546). But neither statute here regulates the conduct of religious employers in a manner that it does not also regulate secular employers. Similarly, a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877. But neither law here provides either agency with a mechanism for granting individualized exemptions to anti-discrimination laws, and CEA does not argue otherwise.

The fact that neither law extends universally to *all* employers or healthcare providers does not change the general applicability analysis, as CEA's own cases show. The Third Circuit's decision in *Blackhawk v. Pennsylvania* held that a law that imposed a fee for keeping wildlife in captivity was not generally applicable because it exempted circuses and zoos. *See* 381 F.3d 202, 211 (3d Cir. 2004). But the court's conclusion there was rooted in the fact that a "law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law *to at least the same degree* as the covered conduct that is religiously motivated." *Id.* at 209 (emphasis added). As the Third Circuit later explained, this means that the "relevant comparison for purposes of a Free Exercise challenge to a regulation is between its treatment of certain religious conduct and the

analogous secular conduct that has a *similar impact on the regulation's aims*." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007) (emphasis in original). Thus, a regulation violates the Free Exercise Clause "only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated as to the regulatory purpose." *Id.* CEA makes no claim that either § 1557 or Title VII treat religious employers or healthcare providers worse than "similarly situated" secular employers or providers. Nor could it, because both laws regulate religious and secular employers and providers on equal terms. Because "nothing in the text of the statutes . . . purports to burden anyone on the basis of religious relief" and because "there [is not] any indication that the statutes were designed to impose such burdens . . . the statutes are neutral and generally applicable." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1025 (8th Cir. 2018) (holding "Plaintiffs fail to state a claim under the Free Exercise Clause").

CEA's reliance on *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) is unhelpful for similar reasons. That decision concerned California's COVID-19 restrictions on certain places of public gathering. The Court held the restrictions were not generally applicable because secular facilities, such as retail stores, movie theaters, and hair salons, were subject to less onerous restrictions than religious gatherings. *Id.* at 1297. The Court rejected the argument that religious gatherings were treated on equal terms with *other* secular activities, explaining that strict scrutiny is required "whenever [laws] treat *any* comparable secular activity more favorable than religious exercise." *Id.* at 1296. But neither § 1557 nor Title VII expressly treats religious employers or providers less favorably than secular ones, as the California regulations did with respect to public gatherings. Indeed, both laws treat similarly situated secular and religious entities *identically,* and accordingly CEA cannot point to a "comparable" secular employer or provider treated more favorably under § 1557 or Title VII than religious ones.

Plaintiff's Free Speech claim against HHS falters as well, as CEA cannot point to HHS rules or regulations compelling or chilling speech. CEA notably frames its speech claim in hypothetical terms. For example, it contends HHS "require[s] a Christian doctor to tell a gender dysphoric patient, 'I can perform surgery to make you look more like a boy.'" PI Mem. at 32. But nowhere does CEA actually allege that one of its members has been compelled to make such speech, or chilled from

opposing such speech, or even that a member has actually been asked by a patient about gender-transition services. It next argues that HHS requires its providers to revise their written policies to affirm the availability of gender-transition services, but it points only to the 2016 Rule, which has been vacated and rescinded in relevant part, as evidence of such a requirement. *Id.* Plaintiff's remaining Free Speech arguments all stem from its mistaken assertion that HHS has mandated specific acts under the banner of prohibiting gender-identity discrimination.

CEA's Free Speech claim is further flawed because, while HHS has not yet specified what policies or actions might run afoul of § 1557's prohibition on gender-identity discrimination, any such pronouncement would regulate *conduct*, and not speech. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006). The Supreme Court has made clear that allegedly compelled speech that is "incidental" to a rule's "regulation of conduct" does not implicate freedom of speech. *Id.* It has "never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Thus, as relevant here, Congress may lawfully "prohibit employers from discriminating in hiring on the basis of race" and the fact that such a prohibition "require[s] an employer to take down a sign reading 'White Applicants Only' hardly means the law should be analyzed as one regulating the employer's speech rather than conduct." *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 389 (1992)). In this case, of course, CEA has not even shown that its members' *conduct* in opposing gender-transition services is regulated by HHS, but the application of anti-discrimination laws would nonetheless be a regulation of conduct, not an abridgment of free speech.

### C. EEOC and HHS have not violated the Administrative Procedure Act.

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.[12] If those prerequisites are met, a reviewing court may "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

---

[12] Within the Eighth Circuit, these "requirements are part of a party's cause of action and are not jurisdictional." *Iowa League of Cities v. EPA*, 711 F.3d 844, 863 n.12 (8th Cir. 2013).

with law."  *Id.* § 706(2)(A).  CEA has failed to identify any final agency action in this case, and moreover, its members have adequate and exclusive alternative remedies—resulting in *de novo* judicial review—under both anti-discrimination statutes.  Because the "mandates" CEA challenges are fictitious, it cannot plausibly allege they are contrary to law, or arbitrary and capricious.  But even if CEA purported to challenge the agencies' *actual* policies, it cannot plausibly allege they are contrary to law because both agencies have done nothing more than interpret their respective anti-discrimination statutes to prohibit gender-identity discrimination, applying the same reasoning used by the Supreme Court in *Bostock*.  Finally, as the *RSM* court concluded, judicial comity weighs in favor of not entering any relief that would interfere with the orders of coordinate courts.

> 1.  *There is no final agency action in this case.*

"[T]wo conditions . . . generally must be satisfied for agency action to be 'final' under the APA.  First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (citation omitted).

Despite training most of its complaint on the two so-called "mandates," CEA conspicuously does not allege that either mandate qualifies as final agency action for purposes of its APA claim.  *See* Compl. ¶¶ 243-244.  That makes sense—these "mandates" do not exist in any rule, are not reflected in any document or policy, and cannot be evinced by either agency's prior practice.  If those "mandates" do not rise to the level of final agency action—which is to say, agency action "from which legal consequences will flow"—it is difficult to conceive how they warrant preliminary relief, never mind provide a basis for the Article III standing necessary to maintain this suit.

Plaintiff's complaint instead points to actual agency materials as possible final agency action, but none qualifies here.  For HHS, those items are its "2016 Rule, 2020 Rule, and 2021 Notice of Enforcement."  Compl. ¶ 243.  For EEOC, CEA cites to three "practice and guidance" documents, namely the EEOC Document and two webpages offering generalized guidance on Title VII, each reflecting that EEOC "interprets sex under Title VII as including gender identity."  *Id.* ¶ 244.  CEA

refers to these materials—and not the "mandates"—as "the agency rules." *Id.* ¶ 245.

But, as an initial matter, most of these documents are *not* legislative rules, or otherwise final agency action. The HHS Notification and EEOC's various "practice and guidance" documents cannot qualify as final agency action because they are only statements of agency interpretation and policy about statutes. The Notification, for example, merely "inform[s] the public that" HHS "will interpret and enforce § 1557's prohibition on discrimination on the basis of sex" in a manner "consistent with the Supreme Court's decision in *Bostock* and Title IX." 86 Fed. Reg. at 27,984-85. The EEOC Document similarly states that it does "not have the force and effect of law" and does not "bind the public in any ways." EEOC Document at 3. Instead it is "intended only to provide clarity to the public regarding existing requirements under the law or agency policies." *Id.* The two EEOC webpages cited by CEA say only that under Title VII "it is illegal to discriminate against someone . . . because of," *inter alia*, "gender identity," Compl., Ex. 3 at 1; *see also* Ex. 5 at 1 (same), which also amounts to nothing more than a restatement of the reasoning of *Bostock*.

Such "interpretive rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which they are addressed.'" *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (citing Edwards, Elliott, & Levy, Federal Standards of Review 157 (2d ed. 2013)) (citation omitted). Specifically, these materials cannot qualify as final agency action because "[i]nterpretive rules do not . . . have the force and effect of law and are not accorded that weight in the adjudicatory process." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 240 (D.D.C. 2014) ("[A] rule that has no legal effect independent of the source it purports to interpret is not final agency action."). Indeed, the EEOC Document itself disclaims any binding legal effect, and courts, including the Eighth Circuit, routinely find that the kinds of EEOC documents at issue here lack "the force of law." *In re Union Pacific R.R. Empl. Practices Litig.*, 479 F.3d 936, 943 (8th Cir. 2007) (collecting cases).

CEA cannot allege that its members' legal obligations derive from these guidance materials, several of which are merely printouts of informational pages on EEOC's website. Such agency guidance does not qualify as final agency action where it merely "reminds [the public] of existing

statutory duties" and "merely track[s] the statutory requirements and thus simply explain[s] something the statute already required." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992)) (cleaned up); *see also Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432-433 (4th Cir. 2010) (an agency document that "informs the regulated community" of the agency's position on "what violates the law" does not determine rights or obligations, and thus is not final agency action). Thus, "[t]he agency cannot apply or rely upon [these guidance documents] as law because a general statement of policy only announces what the agency seeks to establish as policy." *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974); *see Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (explaining such agency materials "create[] no new legal obligations beyond those the [statute] already imposed").

Indeed, to best illustrate how these materials are not final agency action, imagine that the agencies had simply never created or issued them. Both HHS and EEOC could *still* interpret their respective anti-discrimination statutes as barring gender-identity discrimination based on the reasoning of *Bostock*—which is all that these documents do. *See Von Aulock*, 720 F.2d at 181. If either agency applied that interpretation in a particular enforcement proceeding, the target of that enforcement could, of course, argue the agency exceeded its statutory authority or runs afoul of RFRA. *See AT&T Co.*, 270 F.3d at 976 (explaining agency's view of the law "has force only to the extent the agency can persuade a court to the same conclusion"). Thus, if HHS or EEOC ever chooses to assert these interpretations, they must be "prepared to support the policy just as if the[se] policy statement[s] had never been issued." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.). But it is too soon to tell whether HHS or EEOC have improperly applied the legal interpretations in these documents to the facts of a particular case. Once an agency "interprets the law in an adjudication, a party can challenge that interpretation as being inconsistent with the agency's organic statute, or with its regulations." *CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 33 (D.C. Cir. 2014). But "[i]n all such cases . . . if the contested agency action takes place during the course of an adjudication, judicial review comes only at the conclusion of the proceedings." *Id.*

Finally, CEA cannot argue that these materials constitute final agency action because its

members must allegedly conform their behavior to the agencies' view that gender-identity discrimination is prohibited under § 1557 and Title VII. The fact that the policy statements broadly express the agencies' views on the "legality" of certain conduct—namely, the scope of discrimination "on the basis of" or "because of" sex—"does not change the character of the [documents] from a policy statement to a binding rule." *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 808 (D.C. Cir. 2006). Rather, "the case law is clear that [courts] lack authority to review claims under the APA 'where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to that party.'" *Id.* (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.)); *see also AT&T Co.*, 270 F.3d at 975 (same). That is precisely what the policy statements here do—they share the agencies' respective interpretations of statutory text, which are based on the Supreme Court's decision in *Bostock*. CEA's disagreement with that interpretation does not itself adversely harm CEA or its members, but rather "only affects [them] adversely on the contingency of future administration action." *Lee v. Schultz*, No. CIV 14-4117, 2015 WL 1281880, at *9 (D.S.D. Mar. 19, 2015) (quoting *DRG Funding Corp. v. Secretary of Housing and Urban Development,* 76 F.3d 1212, 1214 (D.C. Cir. 1996)). "'Practical consequences, such as the threat of a party having to defend itself in an administrative hearing should the agency actually decide to pursue enforcement, are insufficient to bring an agency's conduct under judicial purview.'" *Id.* (quoting *Nat'l Ass'n of Home Builders v. Norton,* 415 F.3d 8, 15 (D.C. Cir. 2005)). And as explained, the risk of such an enforcement measure to CEA's members is wholly conjectural.

The only remaining "agency rules" CEA points to—HHS's 2016 Rule and 2020 Rule— similarly do not satisfy the final agency action requirement here. The 2016 Rule does not suffice for the simple reason that its gender-identity discrimination provision was vacated. It therefore cannot be agency action "by which rights or obligations have been determined, or from which legal consequences will flow." *Hawkes Co.*, 136 S. Ct. at 1813; *see also Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc) ("When a law has been amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot.").

The 2020 Rule likewise does not serve as final agency action here because CEA and its

members face no actual or imminent risk of enforcement from it.  Under the APA, courts "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (citation omitted).  Even to the extent the 2020 Rule's recitation of the statutory definition of sex discrimination now arguably proscribes gender-identity discrimination, either due to *Bostock* or the Notification, that still does not pose any actual or immediate harm to CEA members because HHS has not yet, and may never, enforce that prohibition in the manner Plaintiff assumes it will.  *See supra* Argument § I.B; *see also Dakota Res. Council v. N. Dakota Pub. Serv. Comm'n*, No. 1:12-CV-064, 2013 WL 12085480, at *7 (D.N.D. Sept. 3, 2013) (finding no final agency action where plaintiff "fail[ed] to identify any circumstance" in which challenged guidance memo "was applied for the purpose" allegedly harming plaintiff); *Communities for a Great Nw., Ltd. v. Clinton*, 112 F. Supp. 2d 29, 38 (D.D.C. 2000) (declining APA review where plaintiffs "have not challenged a specific final agency action that has caused or is expected to cause them imminent harm").

Finally, even if the 2020 Rule *did* define sex discrimination to include gender-identity discrimination *and* CEA's members faced a risk of enforcement—neither of which is the case—final agency action would still be lacking until actual enforcement occurred.  *See Standing Rock Housing Auth.*, 585 F. Supp. 2d at 1118-1120 (challenge to an EEOC administrative subpoena was not ripe due to lack of final agency action).  In *Standing Rock* the court explained that, even though EEOC had taken an active investigatory step by issuing an administrative subpoena to the plaintiff, there was no "final" agency action until the EEOC sought to enforce the subpoena in court or filed suit.  *Id.* at 1120.  The court concluded that to "hold otherwise would result in this Court judicially interfering with the proper functions of the EEOC," *id.*, and further explained that "[i]f and when the EEOC or the charging party files suit in district court . . . the plaintiff will have the opportunity to refute the charges."  *Id.* (quoting *Georator*, 592 F.2d at 768).  In other words, HHS will not have taken final agency action towards one of CEA's members under the 2020 Rule until it actually exercises its discretion to enforce the rule against them, including going through all of the steps and procedural safeguards involved in administrative enforcement, during which the member may present its full suite of arguments.

2.   *Both § 1557 and Title VII provide alternate remedies that preclude review under the APA.*

Plaintiff's APA claim is also precluded by the fact that its members have an adequate alternative judicial remedy under both § 1557 and Title VII.  "[T]he APA only allows review where there exists 'no other adequate remedy in a court.'"  *Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*, 643 F.3d 1142, 1148 (8th Cir. 2011) (quoting 5 U.S.C. § 704).  "[Section] 704 'does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures.'"  *Johnson v. Vilsack*, 833 F.3d 948, 955 (8th Cir. 2016) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).  CEA's members possess adequate alternative remedies here—they may defend against any future enforcement of either Title VII or § 1557 under the express administrative and judicial review provisions crafted by Congress.  *See* 42 U.S.C. § 18116(a) (incorporating, *inter alia*, Title IX's administrative and judicial review procedures); 42 U.S.C. § 2000e-5 (Title VII procedures).

The "adequate" alternative relief available to Plaintiff "need not provide relief *identical* to relief under the APA" to have preclusive effect under § 704 so long as it offers "the same genre" of relief.  *Garcia v. Vilsack*, 563 F.3d 519, 522-523 (D.C. Cir. 2009).  Such relief exists where agency statutes "provide[] a framework for obtaining judicial review."  *Defs. of Wildlife v. EPA*, 882 F.2d 1294, 1302 (8th Cir. 1989) (holding "the district court had no jurisdiction to consider" claims under the APA in such cases); *see also Garcia*, 563 F.3d at 523 (holding alternate relief is "adequate" under § 704 if it "affords an opportunity for *de novo* district-court review"); *Bowen*, 487 U.S. at 903 (review unavailable under § 704 where agency statutes provide "specific procedures" leading to judicial review).

Both § 1557 and Title VII provide "framework[s] for obtaining judicial review," *Defs. of Wildlife*, 882 F.2d at 1302, including specific provisions affording "an opportunity for *de novo* district-court review," *Garcia*, 563 F.3d at 523.  Section 1557 incorporates the "enforcement mechanisms provided for and available under," *inter alia*, Title IX.  42 U.S.C. § 18116(a).  Title IX, like the other statutes incorporated into § 1557, sets out provisions to enforce its prohibition on discrimination "on the basis of sex."  *See* 20 U.S.C. §§ 1682-1683; *see also* 45 C.F.R. § 80.6-80.8.  In limited circumstances, Title IX's enforcement provisions permit agencies to withhold federal funding to entities discriminating on the basis of sex, but only after "there has been an express finding on the record, after opportunity for

hearing, of a failure to comply" with the title.  20 U.S.C. § 1682.  And these enforcement provisions further require the agency to first advise the subject about its lack of compliance and then "determine[] that compliance cannot be secured by voluntary means."  *Id.*  To the extent a person is aggrieved by agency enforcement under Title IX's enforcement provisions, Title IX grants "judicial review as may otherwise be provided by law" or, alternatively, "judicial review of such action in accordance with chapter 7 of Title 5," *i.e.* the APA.  *Id.* § 1683.

For its part, EEOC investigates claims of discrimination filed by employees or job applicants and engages in a conciliation process with the employer if it finds reasonable cause to believe a Title VII violation occurred.  *See* 42 U.S.C. § 2000e-5(b), (f).  Only then may EEOC either bring an enforcement action or issue a right-to-sue notice to the private complainant, both of which provide for *de novo* district court proceedings.  *Id.* § 2000e-5(b); *see also* 29 C.F.R. §§ 1601.27-1601.29.

Because both statutory regimes guarantee *de novo* review of any enforcement action, CEA and its members "almost by definition . . . have an adequate remedy in a court."  *NAACP v. Meese*, 615 F. Supp. 200, 203 (D.D.C. 1985) (explaining that defending against a government motion is a "far more appropriate, far more logical remedy than a lawsuit here seeking injunctive relief"); *see also Temple Univ. of Commonwealth Sys. of Higher Educ. ex rel. v. Brown*, No. CIV. A. 00-CV-1063, 2001 WL 185535, at *7 (E.D. Pa. Feb. 23, 2001) (concluding plaintiff possessed alternative remedy precluding review under § 704 because it could "defend any . . . charges should the government cho[o]se to pursue them"); *New Jersey Hosp. Ass'n v. United States*, 23 F. Supp. 2d 497, 501 (D.N.J. 1998) ("the ability and opportunity to raise a defense" to an action is "an adequate remedy in a court"); *Ass'n of Am. Med. Colleges v. United States*, 34 F. Supp. 2d 1187, 1193 (C.D. Cal. 1998) (similar); *U.S. Steel Corp. v. Fri*, 364 F. Supp. 1013, 1018-1019 (N.D. Ind. 1973) (similar).

Indeed, the Eighth Circuit has already found that administrative and judicial review provisions akin to those in Title IX and Title VII qualify as an alternate remedy under § 704.  *See Great Rivers Habitat All. v. FEMA*, 615 F.3d 985, 989 (8th Cir. 2010).  That decision affirmed a district court's conclusion that § 4104(g) of the National Flood Insurance Act of 1968 precluded review of flood elevation determinations under the APA.  *Id.*  Like the anti-discrimination administrative review

processes here, § 4104 permitted private persons to present arguments directly to the agency through an administrative process and, if "aggrieved by any final determination of the Administrator upon administrative appeal," to further "appeal such determination to the United States district court" with "[t]he scope of review by the court . . . as provided by chapter 7 of Title 5," *i.e.* the APA. 42 U.S.C. §§ 4140(c), (d), (g). That provision "provide[d] an adequate legal remedy" precluding APA review. *Great Rivers*, 615 F.3d at 989; *see also Defs. of Wildlife*, 882 F.2d at 1299. The same is true here.

Turning to the specific statutes in this case, at least one court, after reviewing Title IX's administrative scheme, concluded that it deprived the court of jurisdiction over a pre-enforcement APA claim under § 704. *See Bd. of Educ. of the Highland Local Sch. Dist. v. Dep't of Educ.*, 208 F. Supp. 3d 850, 860-864 (S.D. Ohio 2016). And similarly, in the context of Title VII, "[c]ourts have uniformly held that no cause of action exists [under the APA] with respect to the EEOC's handling of discrimination claims because Congress has given plaintiffs a right to file a *de novo* lawsuit against the allegedly discriminating employer." *Rude v. Laughing Sun Brewing Co., LLC*, No. 1:20-CV-029, 2020 WL 1073958, at *2 (D.N.D. Mar. 5, 2020) (citation omitted); *see also Travis v. Perdue*, No. 3:20-05071-CV-RK, 2021 WL 328916, at *8 (W.D. Mo. Feb. 1, 2021) (finding APA claim "fail[ed] because judicial review is an adequate remedy for imperfect EEO processing").[13] As the D.C. Circuit has summarily affirmed, this "de novo review provides an adequate remedy in a court within the meaning of 5 U.S.C. § 704 for complaints about the EEOC's administrative process, precluding an APA challenge to the EEOC's procedures." *Wright v. Dominguez*, No. 04-5055, 2004 WL 1636961, at *1 (D.C. Cir. July 21, 2004) (collecting authority).

Further still, § 1557 and HHS's judicial review procedures reflect Congress's desire to preclude *any* pre-enforcement judicial review of Plaintiff's claims. Where it is "fairly discernable" that an elaborate statutory review scheme was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994); *see*

---

[13] Although a CEA member would be the defendant in such a hypothetical proceeding, that makes no difference—the proceeding still grants that defendant adequate judicial review, including the opportunity to raise all of the legal theories asserted here as defenses. *E.g.*, *Meese*, 615 F. Supp. at 203.

*also Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012).  In *Thunder Basin*, the Supreme Court held that a statute providing for administrative proceedings followed by judicial review foreclosed a parallel challenge to an agency's statutory interpretation.  *See Thunder Basin*, 510 U.S. at 207-208.  There, a mine operator challenged an agency's interpretation of a statute that would potentially form the basis for an enforcement action against it.  *Id.* at 216.  Confronted with a review process remarkably similar to those incorporated into § 1557, the Court held that Congress's intent to preclude pre-enforcement judicial review was "fairly discernible in the statutory scheme" under the Mine Act.  *Id.* at 207.

As in *Thunder Basin*, no action has been taken against the plaintiff here (or any of its members).  And here, just as in *Thunder Basin*, "[n]othing in the language and structure of the Act or its legislative history suggests that Congress intended to allow [regulated parties] to evade the statutory-review process by enjoining the [agency] from commencing enforcement proceedings" based on the challenged interpretation.  *Id.*  And as in *Thunder Basin*, a procedural scheme that "applies to all violations of the Act and its regulations" provides the opportunity for judicial review.  *Id.* at 209.

As in *Thunder Basin*, this Court may not consider Plaintiff's anticipatory challenge to the interpretation and enforcement of § 1557 in view of the specifically-crafted alternate remedy.  By providing for administrative review, followed by judicial review, Congress intended to preclude pre-enforcement injunctive relief.  Plaintiff styles its APA claim as primarily challenging the statutory interpretation announced in agency guidance, but the same was true in *Thunder Basin*.  510 U.S. at 205 (describing plaintiff's pre-enforcement "challenge [to] the [agency's] interpretation of" a statute).  CEA "may not bypass the specific method that Congress has provided for reviewing adverse agency action simply by suing the agency in federal district court . . . the specific statutory method, if adequate, is exclusive."  *Great Plains Coop v. CFTC*, 205 F.3d 353, 355 (8th Cir. 2000) (quoting *Gen. Finance Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983)).  This Court should therefore join others that have refused to permit circumvention of the civil rights laws' administrative processes.  *See, e.g., Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (*en banc*); *Sch. Dist. of City of Saginaw v. Dep't of Health, Ed., & Welfare*, 431 F. Supp. 147 (E.D. Mich. 1977); *Highland Local Sch. Dist.*, 208 F. Supp. 3d at 862.

3.    *EEOC and HHS have not acted contrary to law or arbitrarily and capriciously.*

Even assuming § 704's requirements have been met, CEA has failed to allege that any of the so-called final agency action it challenges is contrary to law or arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). As an initial matter, CEA's preliminary injunction motion pivots once more on this point, and contends that it is the "mandates [that] violate these APA provisions" and thus should be set aside. PI Mem. at 36. But the complaint, on its face, does not identify the mandates as the agency action at issue. *See* Compl. ¶¶ 243-245. Plaintiff's inability to concretely fix its APA claim on any specific agency action reflects the lack of any true final agency action or Article III standing in this case altogether, as well the lack of any irreparable harm warranting preliminary injunctive relief.

Even accepting CEA's blunderbuss approach, it fails to plausibly allege a violation of § 706. It first contends that EEOC has acted contrary to law by requiring that "all employers must cover gender transition services in their health plans." PI Mem. at 36. But as explained, EEOC has never had such a requirement. And that requirement is certainly not found in *any* of the three EEOC documents CEA points to as final agency action here. *See* Compl., Exs. 3-5.

Plaintiff's APA claim against EEOC is doomed for that reason alone, but its remaining arguments are similarly flawed. For example, it contends it is "not discrimination on the basis of whether an employee is a man or woman to preclude coverage of gender transitions [sic] services to any men or women" because "[w]hen compared against each other, both sexes are subject to the same equal treatment." PI Mem. at 36. But that argument is little more than a disagreement with *Bostock*, which flatly rejected the group-based comparative approach CEA would prefer. *See Bostock*, 140 S. Ct. at 1741 (explaining Title VII does *not* "focus on differential treatment between the two sexes as groups" and thus it is no defense "for an employer to say it discriminates against both men and women because of sex"); *see also id.* at 1742-1743 (explaining an "employer musters no better a defense by responding that it is equally happy to fire male *and* female employees" who are gay or transgender).

CEA also argues that EEOC acted arbitrarily and capriciously by failing to consider RFRA and other religious-practice implications of its "mandate." PI Mem. at 37-38. But the very materials CEA relies upon stress EEOC *will* appropriately consider religious exemptions when the time is ripe.

The EEOC Document, for example, states that Title VII does not extend to "certain employment discrimination claims by the employees of religious institutions because those employees perform vital religious duties at the core of the mission of the religious institution."  EEOC Document at 5. Accordingly, EEOC "consider[s] and appl[ies], on a case by case basis, any religious defense to discrimination claims, under Title VII and other applicable laws," such as RFRA.  *Id.*  And EEOC's Compliance Manual on Religious Discrimination further advises investigators to "take great care" when a RFRA claim is made and to "seek the advice of the EEOC Legal Counsel in such a situation." Directive 915.063, § 12-1-C (Jan. 15, 2021).  CEA therefore, again, puts the cart before the horse by arguing EEOC has "failed to consider the religious liberty implications" of enforcement.  PI Mem. at 37.  EEOC has no ability to consider RFRA until it receives a complaint from an employee, investigates the complaint, and then is tasked with making a determination about whether an actionable violation of Title VII has occurred.  EEOC's policy statements affirm that it *will* consider any religious liberty implications at that time.  CEA's citation to *Bostock* for this argument only proves the point, because the Supreme Court there stressed that it was premature to determine the religious liberty implications of its own decision.  *Bostock*, 140 S. Ct. at 1754 (explaining such cases "are questions for future cases" where "other employers . . . may raise free exercise arguments that merit careful consideration").[14]

CEA's arguments against HHS fail for the same reason.  Again, its preliminary injunction motion pivots from challenging "HHS's 2016 Rule, 2020 Rule, and 2021 Notice of Enforcement," Compl. ¶ 243, to instead arguing that "HHS's mandate violates the APA."  PI Mem. at 39.  But because no such mandate exists, CEA's claim fails at the outset.

The challenge against HHS is all the more puzzling because CEA acknowledges that the only plausible final agency action at issue here—the 2020 Rule—"correctly concluded" that defining sex discrimination to include gender-identity discrimination was "unlawful and unwarranted."  PI Mem.

---

[14] CEA also argues that because EEOC may not issue substantive rules, it has committed a procedural violation by issuing its "mandate."  PI Mem. at 38.  But CEA, conspicuously, cannot point to any actual substantive rule, or practice or pattern, reflecting this "mandate."

at 39.  That same rule stressed that it would "be implemented consistent with . . . conscience and religious freedom statutes."  85 Fed. Reg. at 37,207.  It is therefore not clear *what* HHS agency action CEA alleges runs afoul of § 706.  To the extent it is the preliminary injunctions entered by the *Walker* and *Whitman-Walker* courts, that is not *agency* action under the APA, *see* 5 U.S.C. § 551(1), and asking this Court to set aside those injunctions runs afoul of judicial comity.  *See infra* Argument § II.C.4.

CEA's remaining arguments are, again, little more than a quarrel with *Bostock*, which subsequently held it is "impossible" to discriminate based on gender-identity without doing so based on sex.  PI Mem. at 41-44.  For example, CEA contends that it is not plausible that Congress, when it enacted § 1557 in 2010, understood a prohibition on sex discrimination to require gender-transition services on demand.  *See* PI Mem. at 42.  *Bostock* expressly rejected the argument that the scope of sex discrimination is cabined to how the enacting legislators understood the concept, stating "[t]hat is exactly the sort of reasoning this Court has long rejected."  140 S. Ct. at 1750-1752.

The remaining arguments CEA offers only highlight the absence of any true agency action here.  *See* PI Mem. at 42-45.  CEA contends the HHS "mandate" is contrary to 42 U.S.C. § 18114, which prevents HHS from promulgating rules that interfere with access to treatment.  But the only promulgated rule CEA points to—the 2020 Rule—contains no mandate, and CEA fails to offer a single example of when one of its healthcare members has been unable to provide medical treatment to patients due to the 2020 Rule.  Similarly, CEA argues that HHS has violated 42 U.S.C. § 300a-7(d), which provides that "[n]o individual" shall be required to perform procedures "contrary to his religious beliefs or moral convictions" as part of a covered health program.  But CEA also cannot point to *any* individual who HHS has compelled to perform gender-transition services in violation of his or her religious beliefs or moral convictions.  Nor, importantly, has CEA alleged that any individual is a part of "a health service program or research activity funded in whole in in part under a program administered by the Secretary of Health and Human services," as required by 42 U.S.C. § 300a-7(d).

Plaintiff's remaining arguments all stem from its errant claim that HHS has staked out the view that it is prohibited gender-identity discrimination not to perform gender-transition services, regardless of factual context or religious objection.  For example, CEA alleges the Notification

"reversed course" on prior policy in the 2020 Rule without explaining why.  PI Mem. at 43-44.  But while the 2020 Rule did not define sex discrimination to include gender-identity discrimination, it *did* acknowledge that the Supreme Court was likely to resolve the issue in *Bostock*, and the NPRM previously acknowledged HHS would permit courts to settle the scope of the statutory language.  85 Fed. Reg. at 37,183; 84 Fed. Reg. at 27,873.  The Notification, in turn, does nothing more than apply the reasoning of the Supreme Court employed in *Bostock*.  But, on its face, it does not state that refusal to provide any one of the myriad medical procedures set forth by CEA qualifies as gender-identity discrimination, never mind over a well-founded religious objection.  *See* 86 Fed. Reg. at 27,985.[15]

4.    *Judicial comity weighs against entering any relief under the APA in this case.*

Plaintiff's claims are not likely to succeed for many reasons, but even if the Court believes that there is some chance of success, it should still decline to grant any relief under the APA.  As the *RSM* court explained, courts may in their "discretion dismiss a declaratory or injunctive suit if the same issue is pending in litigation elsewhere."  513 F. Supp. 3d at 1143 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967)).  As the court further explained, the 2020 Rule is presently subject to the *Walker* and *Whitman-Walker* courts' injunctions.  *Id.*  Accordingly, granting the plaintiffs' injunctive relief in that case would have "inevitably conflict[ed] with decisions of other district courts and simultaneously subject HHS to inconsistent legal obligations."  *Id.* at 1144.  The court thus exercised its discretion to "decline[] to adjudicate the APA claims."  *Id.*

CEA similarly seeks extraordinarily broad injunctive relief for its APA claim, asking that the Court set aside HHS's enforcement of the "2016 Rule, any relevant portion of the 2020 Rule, and HHS's 2021 Notice of Enforcement."  Compl., Prayer for Relief § (D).  Such relief would necessarily conflict with previous injunctions entered by coordinate federal courts, for the reasons the *RSM* court explained.  *See* 513 F. Supp. 3d at 1143-1145.  The Court should exercise similar discretion here if it

---

[15] Plaintiff also argues that HHS was required to use notice-and-comment rulemaking for either the Notification or the so-called "mandate," but it is not clear which they believe was subject to such procedures.  PI Mem. at 44-45.  It is wrong either way—there is no "mandate" and mere policy statements and interpretive rules like the Notification do not require notice-and-comment rulemaking. *See Saint Marys Hosp. of Rochester, Minnesota v. Leavitt*, 535 F.3d 802, 807 (8th Cir. 2008); *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987).

does not first find Plaintiff's APAs claims unlikely to succeed for the reasons above.

## III.   CEA Has Failed To Show Irreparable Harm

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013).  "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "Speculative harm" or a "possibility of irreparable harm" is not enough.  *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *Winter*, 555 U.S. at 22 (2008).  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc.*, 346 F.3d at 844.  That is because the very "basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Id.* (quoting *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999)).

Despite the fact that irreparable harm is the *sine qua non* of preliminary relief, CEA dedicates barely a page of its motion to explaining how its members allegedly face such harm.  *See* PI Mot. at 45-46.  Moreover, CEA offers no basis at all for finding irreparable harm beyond its own purported likelihood of success on its RFRA and constitutional claims.  *Id.*  But CEA is not likely to succeed on the merits of those unripe claims because it lacks standing and has otherwise failed to plausibly plead those claims.  In particular, the reasons undermining CEA's standing cast serious doubt on its claim of irreparable harm.  Neither EEOC nor HHS have required CEA's unidentified members to cover or perform gender-transition services, and none of these members face imminent risk of enforcement.

Even if CEA members *did* face the prospect of enforcement, they could still present the exact same arguments CEA raises here, undermining any claim of *irreparable* harm to that member.  That is why an "injunction against threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." *Travis v. Pennyrile Rural Elec. Co-op.*, 399 F.2d 726, 729 (6th Cir. 1968) (collecting cases and further explaining injunctive relief against future proceeding is "premature" where complaining party can "present all its

objections" at the later proceeding).   Similarly, the Supreme Court in *Thunder Basin* found no irreparable harm where, even if the plaintiff chose to violate the agency's view of the law, any penalties would only become final after administrative and judicial review.   510 U.S. at 217-218; *cf. Ohio Forestry Ass'n*, 523 U.S. at 729-30, 733-734 (holding that case was not ripe where plaintiff "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain," and an administrative process was available before plaintiffs would face any "practical harm").

CEA's claim of irreparable harm is further undermined by its own delay in seeking relief.   "It has long been recognized that delay in seeking relief 'vitiates much of the force of . . . allegations of irreparable harm.'"   *CHS, Inc. v. PetroNet, L.L.C.*, Civ. No. 10–94 RHK/FLN, 2010 WL 4721073 at *3 (D. Minn. Nov. 15, 2010) (quoting *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977)).   While CEA never identifies when precisely it claims the EEOC "mandate" went into effect, it alleges that EEOC has had a "consistent interpretation" of Title VII "for almost 10 years."   Compl. ¶ 64.   CEA also points to actions EEOC took in 2016 to support its incorrect claim that EEOC allegedly enforces Title VII to compel employers to offer insurance covering gender-transition services to employees in all circumstances.   *Id.* ¶¶ 73-76.   But CEA offers no explanation why it has waited *nearly a decade*, and in any event at least five years, to seek relief from what it now claims to be irreparable harm.   The fact that CEA cannot point to any adverse consequences to its members over that time illustrates the point. *See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598 (8th Cir. 1999) (affirming finding of no irreparable harm where plaintiff waited nine years to seek injunctive relief).

CEA has also delayed seeking relief from HHS.   It relies on the *RSM* court's finding that the plaintiffs there faced the risk of enforcement because of the impact of the Supreme Court's decision in *Bostock*, as well as the injunctions entered in *Walker* and *Whitman-Walker*, all of which occurred roughly a year or more before CEA filed this suit.   *See RSM*, 513 F. Supp. 3d at 1135.   This "long delay between the time" the risk of enforcement allegedly arose and when CEA "finally sought injunctive relief . . . rebuts any inference of irreparable harm."   *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) (affirming finding of no irreparable harm where plaintiff waited seventeen months to seek relief).   Indeed, the Eighth Circuit recently affirmed a district court's conclusion that a comparable

**Defendants' Opp. to PI Motion – Page 52**

"*one-year* delay" in seeking injunctive relief against HHS "refuted [plaintiff's] allegations of irreparable harm." *Adventist Health Sys./SunBelt, Inc. v. Dep't of Health & Hum. Servs.*, No. 21-1589, 2021 WL 5170810, at *9 (8th Cir. Nov. 8, 2021) (citing *Novus*, 725 F.3d at 889, 994) (emphasis in original); *id.* (favorably citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (nine month delay undermined claim of irreparable harm), *cert. denied,* 527 U.S. 1036 (1999)). CEA's own allegation that the enforcement risk its members face is longstanding and well-established further undermines any claim of irreparable harm.

## IV.   The Balance Of Equities And Public Interest Favor Denying Plaintiff's Motion

CEA's "failure to show a likelihood of irreparable harm or a reasonable probability of success on the merits [is a] sufficient reason . . . to deny injunctive relief, so it is unnecessary to address [the] other [two] factors." *Powell*, 855 F.3d at 904-905. Nonetheless, the balance of the equities and public interest each weigh in favor of denying CEA's motion. Outweighing Plaintiff's non-existent showing of harm is the substantial public interest in achieving Title VII and § 1557's purpose of eliminating impermissible discrimination in certain workplace and healthcare settings. "Courts presume that a violation of a civil rights statute is an irreparable harm." *ARC of Iowa v. Reynolds*, No. 4:21-CV-00264, 2021 WL 4166728, at *9 (S.D. Iowa Sept. 13, 2021); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993); *Rogers v. Windmill Pointe Vill. Club Ass'n*, 967 F.2d 525, 528 (11th Cir. 1992).

Plaintiff here seeks sweeping relief that if granted would frustrate operation of these anti-discrimination laws and impede the ability of HHS and EEOC to explain their own understandings of relevant legal requirements to both the public and regulated entities. For example, CEA seeks to enjoin enforcement of these anti-discrimination laws on behalf of its unidentified current *and future* members, all without any corresponding showing that any of these members face a real risk of harm or of having their religious practice burdened. Compl., Prayer for Relief. Similarly, it asks this Court to set aside ill-defined agency action that, if granted, could impede HHS and EEOC from developing *actual* policies around gender-identity discrimination. Such improper relief causes "inherent harm to an agency" by preventing it from enforcing statutes and regulations that "Congress found it in the

public interest to direct that [it] develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *cf. Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate."). Plaintiff has failed to show any irreparable harm that would justify inflicting these injuries.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be denied.


Dated November 22, 2021                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Acting Assistant Attorney General

                                           MICHELLE BENNETT
                                           Assistant Branch Director

                                           */s/ Christopher D. Dodge*
                                           Christopher D. Dodge
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street N.W.
                                           Washington, DC 20005
                                           Tel: (202) 598-5571
                                           Email: christopher.d.dodge@usdoj.gov

                                           *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On November 22, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court of North Dakota, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Christopher D. Dodge*
Christopher D. Dodge
Trial Attorney
United States Department of Justice

**Defendants' Opp. to PI Motion – Page 55**